IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
vs.                              )   Case No.:  8:20-CR-402
                                 )
CHRISTOPHER BUONOCORE,           )
                                 )
          Defendant.             )
_____)


**VOLUME I OF II (pp. 1-107)**

**SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**November 17, 2021**
**2:27 p.m. to 4:56 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          LISA M. THELWELL, ESQUIRE
                                United States Department of Justice
                                Office of the United States Attorney
                                400 North Tampa Street
                                Suite 3200
                                Tampa, Florida 33602

**FOR THE DEFENDANT:**          BRIAN H. BIEBER, ESQUIRE
                                GrayRobinson,PA
                                333 Southeast 2nd Avenue
                                Suite 3200
                                Miami, Florida 33131

**ALSO PRESENT:**               CHRISTOPHER BUONOCORE, DEFENDANT
                                LORETTA BUSH, FBI SPECIAL AGENT


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

1                               **INDEX**

2    **GOVERNMENT'S WITNESSES**                              **PAGE**

3    VICTIM 3
     Statement                                                  6
4
     VICTIM 4
5    Statement                                                 22

6    VICTIM 5
     Statement                                                 44
7
     FRANCES BENNETT
8    Statement                                                 68

9    JOHN BUONOCORE
     Statement                                                 72
10
     Defendant's Allocution                                    94
11
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

```
 1            (Call to Order of the Court)

 2            THE COURT:  Good afternoon, everybody.  Welcome to

 3   court.  Go ahead and have a seat.  The rules are masks are

 4   required in the courthouse; they're optional for vaccinated

 5   people in the courtroom.  So if you don't want to have a mask,

 6   you don't have to have it on, but when you go out in the hall,

 7   please put it back on.  Other than that, I think we're ready to

 8   go on this thing.

 9            This is the United States v. Christopher Buonocore.

10   I hope I'm pronouncing that right.  It's Case Number 20-CR-402.

11            Please introduce yourselves, starting with the

12   prosecution.

13            MS. THELWELL:  Good morning, Your Honor.  Lisa

14   Thelwell on behalf of the United States.  Seated at counsel's

15   table is Special Agent Loretta Bush with the FBI.

16            MR. BIEBER:  Good afternoon, Your Honor.  Brian

17   Bieber on behalf of Christopher Buonocore, I'm told, but I was

18   calling him Buonocore for like the first year I knew him.  So

19   I'm told either way.

20            THE COURT:  Buonocore.  Got it.  And he's here with

21   us out of custody.

22            Raise your right hand, please.

23       (The Defendant Is Sworn.)

24            THE COURT:  All right.  Very good.  So it looks like

25   back on January 14th, 2021, he entered a guilty plea to
```

UNITED STATES DISTRICT COURT

 1    Counts 1 through 6 of an information, charging him with

 2    cyberstalking in violation of Title 18 U.S.

 3    Code Section 2261(a)(2)(B), and 2261(b).

 4         I previously accepted his plea and adjudicated him

 5    guilty.  We're now at the stage where we have to go through a

 6    couple things.  But we might take things out of order here,

 7    depending on what the game plan is in terms of we have -- we

 8    have the people on Zoom and things like that, and we got to

 9    kind of sort this out.  I don't know if the Zoom people are

10    picking this up or not, but I assume so.

11         What do you want to do in terms of witnesses

12    testifying and stuff like that?  Give me a game plan here so we

13    can figure out how to do the technology and everything.

14         MS. THELWELL:  Yes, Your Honor.  I have two victims

15    that are present in the courtroom that would like to be heard

16    at the appropriate time, and I believe there are three victims

17    on the Zoom, but at this time, I believe only one of them

18    wishes to be heard.  But at the appropriate time, I will make

19    sure that no one else wants to be heard.

20         THE COURT:  Well, that's what I was thinking.  Rather

21    than having all these people sitting on Zoom and stuff as we go

22    through a bunch of very esoteric conversations about Sentencing

23    Guidelines and stuff like that, let me just hear from the

24    witnesses first, and then we'll talk about the rest of that.

25         Does that work?

1           MR. BIEBER:  Sure, Judge.

2           MS. THELWELL:  Yes, Your Honor.

3           THE COURT:  All right.  So go ahead.  Do you want to

4    get the people on Zoom done first or what makes sense?  I don't

5    know what you're thinking.

6           MS. THELWELL:  Sure.  We can start with anyone on

7    Zoom who would like to be heard.  If you could turn on your

8    camera and turn on your microphone.

9           THE COURT:  Let's see what happens.  We don't do a

10   lot of Zoom here in federal court, but occasionally.  There's

11   someone who's appearing.  Okay.  So you're waving.  That means

12   you can hear us.  Right?

13          VICTIM 3:  I can.

14          THE COURT:  Can you see us?  Can you see me?  What do

15   you see on your --

16          VICTIM 3:  No.  I just have a black screen.  I can't

17   see anything.

18          THE COURT:  I don't know that you really want to see

19   me just staring at you.  This is Judge Barber.

20          VICTIM 3:  There you are.  Now I can see you.

21          THE COURT:  You can see me.  You don't see the rest

22   of the courtroom, though.  But what -- this is a courtroom, and

23   there's -- there's people, you know, out in this audience.

24   There's the defendant and his attorney and the prosecutors and

25   some people in the audience.  And so we have you up on a big

UNITED STATES DISTRICT COURT

Victim 3 - Statement

1    screen on the left side of the room.  So --

2              VICTIM 3:  Okay.

3              THE COURT:  -- that's the situation.

4              You should be sworn in, so raise your right hand.

5    WHEREUPON,

6                          **VICTIM 3,**

7    was called as a witness and, after having been first duly

8    sworn, testified via Zoom Videoconference as follows:

9                          **STATEMENT**

10             THE COURT:  Okay.  All right.  So sometimes people --

11   there's a lot of written statements I've gotten in this case.

12   Sometimes people like to read those themselves.  Sometimes they

13   are okay with the fact that I've already read it.  Sometimes

14   they want to say something totally different.  Sometimes the

15   lawyers want to ask them questions.  So what's -- what's --

16   what's the idea here?

17             MS. THELWELL:  Your Honor --

18             THE COURT:  First of all, what's your name.  Sorry.

19   We didn't ask you your name.

20             VICTIM 3:  My name is          .  I'll be

21   reading my statement.  I had just submitted a new statement a

22   few days ago.  I'm not sure you got that.

23             THE COURT:  Well, actually, I didn't.  I just got

24   handed that to me when I was coming into court.  So yours is

25   the one I haven't looked at yet, so that makes perfect sense

                    UNITED STATES DISTRICT COURT

Victim 3 - Statement

1    for you to read it because it would be new information.

2              Is that okay for her to read that?  Is that what you

3    want to do?

4              MS. THELWELL:  Yes, Your Honor.  Thank you.

5              THE COURT:  All right.  Go ahead.  I have it here

6    somewhere, so I'll follow along as soon as I get it.  Go ahead.

7              VICTIM 3:  Okay.  Okay.  Ready?

8              THE COURT:  Yeah.  Go ahead.

9              VICTIM 3:  Okay.  So my statement is for Chris

10   directly, so I'll be speaking to you.

11             Chris, when they first asked me if I wanted to attend

12   your sentencing, I declined.  I submitted my original

13   statement, and I was okay with them reading it for me.  I

14   wanted to avoid traveling from New York, potentially exposing

15   myself to COVID, taking time off work, and leaving my

16   three-year-old son for the first time ever.

17             Most of all, I didn't want to see you.  I was scared

18   of backtracking on all of the progress that I had made trying

19   to recover from what you did to me five years ago, which I have

20   still absolutely not recovered from, but I work on it every

21   single day.

22             However, when I received your apology letter back in

23   August, I completely changed my mind.  I immediately told them

24   I needed to be there.  My original statement was written from a

25   place of fear.  I was afraid of what would happen to me and my

                    UNITED STATES DISTRICT COURT

Victim 3 - Statement

1   family, and also afraid of what would happen to you and yours.

2          I've known you and your family almost my entire life.

3   I considered you my best friend at one point.  I cared about

4   you and your family.  I trusted you and your family.  And still

5   in my heart, I do wish the best for all of you.

6          I believe that's the difference between you and I.  I

7   am not okay with willingly and knowingly making the decision to

8   destroy someone's life, any person's life in general, but

9   especially someone that I cared about.  But that's what you did

10  to me.  You literally destroyed my life, and I had to rebuild

11  it.  I am still working on rebuilding it, and I don't believe

12  that I'll ever get back to the place that I was before you did

13  this to me.

14         I made travel arrangements for the original two

15  sentencing dates, but, unfortunately, this time around, I'm not

16  able to attend in person due to not being able to find child

17  care for my son.

18         I would still like to explain why your apology

19  infuriated me to the point where I needed to attend your

20  sentencing.  A few things were clear to me when I read your

21  apology.  The first was that you don't understand the severity

22  of what you did to me and how you impacted my life.  You didn't

23  just change from the boy that I used to know.  You absolutely

24  traumatized the girl that you used to know.  You forced me for

25  months to live in constant fear every second of every day.

Victim 3 - Statement

1          When you posted me on those websites with my pictures

2     and contact information, you brought truly terrifying and

3     potentially dangerous people into my life that constantly

4     harassed me, threatened me, blackmailed me, and put my life at

5     risk.

6          I had a complete stranger call me at work one day for

7     you, telling me that I needed to cooperate or my entire life

8     would be jeopardized.  From that moment forward, my life has

9     not been the same.  I had to leave that job because of my

10    concerns with my safety, as well as the stress that this put on

11    my work environment.  I eventually got a new job that I still

12    cannot talk about on any social media platform out of fear that

13    this will all happen again.  Not only did you cost me a job

14    that I loved, you will now affect me in any job I ever have

15    going forward.

16         When you were still harassing me anonymously, before

17    I knew it was you behind the keyboard, you told me that you

18    could walk into my job at any time, and I wouldn't even know it

19    was you.  That one statement, and the fear that I felt in that

20    moment will never leave me.  I feel it every single time a man

21    I don't know walks through the door at any job, in any store,

22    in any building, or on any social media platform.  I am

23    constantly questioning the intention of people I don't know,

24    and it affects my ability to interact with new customers and do

25    my job properly as well as make new friends in social settings.

Victim 3 - Statement

```
 1              Not only did you affect my relationship with new
 2    people, you forever changed the relationships I had with people
 3    already in my life.  For months, I had no idea who was
 4    harassing me, but I knew it was somebody that knew me
 5    personally.  I knew it was someone that I was friends with on
 6    Facebook that had access to my private profile.  In trying to
 7    find you, I deleted hundreds of people from my life, some of
 8    whom I even confronted and accused of being my harasser.  I
 9    have never been able to repair those friendships, nor have I
10    ever lost the feeling that anyone and everyone I know can be
11    capable of hurting me so severely.
12              You have taken away my ability to fully trust anyone,
13    and I don't know if I'll ever get that back.  I have had issues
14    with trust in the past, and that was something that took me
15    years to overcome.  You ruined that.  You also almost ruined my
16    relationship with my fiance.
17              Thankfully we made it through, but now it's my son
18    that pays the price for the time and energy that I spend on the
19    damage that you've caused.  Every minute I spend on you trying
20    to repair the fear and anxiety caused by you takes away from my
21    focus on him.  He is just as much a victim of yours as I am.  I
22    worked so hard throughout my life to set myself up to be a
23    great mother, and you took a part of that away from him, which
24    brings me to the next part of your apology that I need to
25    address, responsibility.
```

UNITED STATES DISTRICT COURT

Victim 3 - Statement

1          You have made so many excuses for your behavior that
2   I still don't feel like you have truly accepted responsibility
3   for any of your actions.  We have all had trauma in our past.
4   That is not an excuse to hurt people the way that you have.

5          For example, I also felt abandoned by my mother when
6   she gave me up for adoption at birth.  I still don't know who
7   my birth father is.  I grew up in an abusive household with an
8   alcoholic adopted dad, and I did not have an easy childhood.
9   My toxic relationship with my family and the years of dating
10  toxic men, like my dad, contributed to my own mental health
11  issues.

12         I've suffered from depression and anxiety for most of
13  my life.  I have spent time in hospitals.  I have been
14  suicidal.  I have been in therapy for over a decade, and I have
15  put so much work in overcoming these issues and creating a
16  better life for myself.

17         The difference between you and I is that I will never
18  use my trauma as an excuse for anything.  I know that I'm
19  responsible for every decision I make, and that the decisions
20  affect the people around me.

21         You did not take my history and my mental health into
22  account before you made the decision to harass me, blackmail
23  me, terrorize me, and give some of the worst people on the
24  Internet the opportunity to make my life a living hell.  Yet,
25  here you are now asking us to take pity on you for your history

Victim 3 - Statement

1  and mental health issues.  You deserve to be treated in the

2  same way you chose to treat us.  How dare you be so completely

3  hypocritical.

4           My final issue with your apology is that I do not

5  believe you're sorry for what you've done.  I believe you're

6  only showing remorse because you're now finally facing the

7  consequences for the decisions that you have been making

8  repeatedly for at least the last decade.

9           Back in 2006, in the middle of you harassing me, when

10  you were still anonymous, I explained to you the trauma that

11  your actions were causing me.  I told you that I was scared for

12  my life.  I told you that I had gone to the police and filed a

13  police report.

14           Your response was that I would never find you, and

15  that you would check on me again in three months to see if I

16  was willing to cooperate then.

17           When I finally did identify you, you promised me you

18  would never do it again to me or anyone else.  You told me you

19  were going to get help.  You promised that you were done, and

20  you told me you were grateful for the second chance that I gave

21  you.

22           Little did I know, it wasn't your second chance.  You

23  had already done this several times before with other women.

24  And it would only be months after apologies to me that you

25  would do it again.  This time, one of your victims was a child.

Victim 3 - Statement

1    When I heard that you had put a 14-year-old girl on those same

2    websites with her identifying information, with the name of her

3    school on her shirt in the picture and told these people that

4    you wanted to see her raped, suggesting that you would

5    potentially reward these people for doing this to her, the

6    level of guilt that I found in that moment for letting you get

7    off easy for what you did to me was worse than any feeling I

8    have felt in this entire process.

9           You not only lied to me about never doing it again,

10   you got worse.  You need to understand that these things that

11   you put on the Internet could have caused her or any of us to

12   have actually been assaulted or raped in real life.  I can't

13   even imagine the amount of guilt that I would have had if that

14   had actually happened to her.

15          And that's the reason I wanted to say all of this to

16   your face for the next girl that you do this to, because I know

17   you will do this again when you get out.  And I am so scared

18   that the next time we're in this courtroom, it will be because

19   someone's daughter got physically assaulted directly because of

20   what you did.

21          No more promises, no more apologies, no more saying

22   that you're going to get help and then going right back to it.

23   Until you truly understand the impact that you're having on

24   these women's lives and how serious and dangerous your actions

25   are, you will not stop.  That realization has not happened for

Victim 3 - Statement

 1   you yet, regardless of how many times you've been caught,

 2   confronted, even had police reports filed, regardless of how

 3   much therapy you've done thus far, nothing else has made any

 4   impact on you at that point.  And, unfortunately, harsh

 5   punishment might be the only way that you learn.

 6           I hope this Court can see through the excuses you've

 7   made and the act that you've put on to see how evil and

 8   calculated your decisions have been and grant you enough time

 9   away from the outside world to truly reflect on how you've

10   gotten yourself to this point.  The entire life of your next

11   victim might be determined by the decision made here today and

12   the work that you put into making decisions, better decisions

13   going forward.

14           I'd like to thank the Court for this opportunity to

15   submit this statement.  Thank you to the judge for hearing us

16   and letting us share our experiences.  Thank you to everyone

17   fighting so hard for our justice.  Thank you to the other

18   victims for speaking out.  I wish everyone a little peace and

19   closure throughout this process.

20           Thank you.

21           THE COURT:  All right.  I'd like to ask you a couple

22   questions about what you just said.  Can you hear me okay?

23   Maybe not.  Am I muted?  We're still working on the technology

24   here?  Can you hear me?  Can you see me?

25           VICTIM 3:  Me?  Are you talking to me?  Sorry.  I

Victim 3 - Statement

 1    can't hear you.

 2              THE COURT:  Can you hear me now?  Can you hear me

 3    now?

 4              VICTIM 3:  A little bit.

 5              THE COURT:  How about now?  Is it --

 6              VICTIM 3:  Yes.  Better.

 7              THE COURT:  You can hear now.  Is it -- maybe you

 8    have to turn your volume up on your computer.  Is that the

 9    issue, because I'm pretty loud here.

10              VICTIM 3:  Okay.  I can hear you.

11              THE COURT:  You can hear me now.  All right.

12              VICTIM 3:  Yes.

13              THE COURT:  Couple questions for you.  I take it -- I

14    have a long document called a presentence report that gives me

15    a lot of information about the -- everybody involved in this.

16    And I -- reading it, I take it you're the person that's

17    mentioned as the childhood friend that went to elementary and

18    middle school with him.  Right?

19              VICTIM 3:  Yeah.  That's me.

20              THE COURT:  Because it only tells me initials and

21    stuff like that.  So I wasn't totally sure.

22              Couple questions.  Number one, did you do anything to

23    get on his radar screen?  I mean, I -- I understand people

24    get -- you know, they do -- they do these things because maybe

25    they're mad at an ex-girlfriend or something like that.  Is

                   UNITED STATES DISTRICT COURT

Victim 3 - Statement

 1    there some history there or some reason that you were brought

 2    into this that you're aware of?

 3                VICTIM 3:  No.  So Chris and I never dated.  I'm not

 4    an ex-girlfriend.  I was friends with him throughout all of

 5    middle school, close friends.  His -- I was friends with his

 6    family as well.  We never had any sort of falling out.  The

 7    only thing that happened was I had moved out east in high

 8    school, and we lost touch.  We had regained touch because we

 9    were out -- I was starting a softball team, and he wanted to

10    join it.  So we had a little bit of contact.  But for the most

11    part, we hadn't even spoken in years.  There was never anything

12    that I did to him.

13                THE COURT:  Okay.  Just --

14                VICTIM 3:  Anything to warrant this.

15                THE COURT:  Just a second.  So you went to different

16    high schools.  Right?

17                VICTIM 3:  Yeah.  Yeah.

18                THE COURT:  So you didn't --

19                VICTIM 3:  Yeah.  We were together up until eighth

20    grade, and then we separated.

21                THE COURT:  Roughly, what year were you in eighth

22    grade, finished eighth grade?

23                VICTIM 3:  2001.

24                THE COURT:  Okay.  And then you then had contact with

25    him again in what year?

Victim 3 - Statement

1          VICTIM 3:  I don't know the year off the top of my

2     head.

3          THE COURT:  You just said something about a softball

4     team.  Is that what you're talking about?

5          VICTIM 3:  Yeah.  There was a softball team that I

6     had started.  I don't know.  Maybe like eight years ago,

7     something like that.

8          THE COURT:  So this is 2021.  So 2014, something like

9     that, roughly?

10         VICTIM 3:  Around there, give or take, roughly, yes.

11         THE COURT:  Okay.  And when did you start getting

12    this -- this harassment stuff happening to you.  Was it before

13    2014 or after or.

14         VICTIM 3:  No.  It was after.  It was after.  This

15    started five years ago, exactly.

16         THE COURT:  So what would that be, 20 -- don't make

17    me do all this math.  That's why we go to law school, because

18    we can't do math.

19         VICTIM 3:  Sorry.  I wasn't prepared for questions.

20         THE COURT:  2016?

21         VICTIM 3:  Yeah.  2016, yes.

22         THE COURT:  All right.  So you last saw him in the

23    eighth grade in 2001.  2014, there was some conversations

24    about -- did you actually -- was he on a softball team?  Did

25    you do softball with him?

                    UNITED STATES DISTRICT COURT

Victim 3 - Statement

1    VICTIM 3:  So we had one softball practice that we

2    were together at.  We ended up not doing the team, though.  So

3    it was just that one softball practice.

4    THE COURT:  All right.  And then so there's middle

5    school.  There's a softball practice.  And then this stuff

6    starts for, as far as you can tell, no reason.

7    VICTIM 3: Yes.  No reason.  Absolutely.  That's why

8    it took me so long to identify that it was him, because he was

9    not even on my radar at that point.

10   THE COURT:  Okay.  Now, when you get contacted -- the

11   information I have is all very general.  Were you asked to give

12   money, to give more pictures?  What is it that you were being

13   asked to do?

14   VICTIM 3:  So they weren't asking me for anything

15   specifically.  They were just telling me to cooperate, not to

16   panic, to just have discussions with them, stay calm, and it

17   was implied that there would be requests later on, but they

18   didn't ask me for anything.  It just seemed like the main

19   intention was to scare me and just continually harass me.

20   THE COURT:  And how long did those types of

21   harassment conversations occur over?  How much time, roughly?

22   VICTIM 3:  So it started, I guess, around maybe

23   Octoberish of that year, and then I had identified him by, I

24   believe, January of 2017.  So [unintelligible] identified that

25   it was him, it had stopped.

UNITED STATES DISTRICT COURT

Victim 3 - Statement

1    THE COURT:  Okay.  Now, at some point, it tells me

2    that there's a picture of you from when you were 15.  How did

3    he get -- he had a picture of you, an inappropriate picture of

4    you?  Is that what I'm reading?

5    VICTIM 3:  So Chris was never given that picture,

6    which is why I also didn't know that it was him that texted me.

7    That first message that I received had that picture of my

8    breasts from ten years prior, more than ten years, and that was

9    when it started.  They just said, "I have this picture of you.

10   I don't want to send it to anyone else.  But if you cooperate,

11   then that won't be an issue."  So there was a picture of me

12   that I -- sorry.  Go ahead.

13   THE COURT:  You're getting ready to answer my

14   question.  I'm trying to figure out how this picture -- this is

15   a picture you took on your phone when you were in the eighth

16   grade and it somehow surfaces ten years later?  I'm trying to

17   figure out how that happened.

18   VICTIM 3:  So I never got a direct answer for that

19   either.  Maybe you could ask Chris.  But I did send that

20   picture to a boyfriend of mine that I was dating back in the

21   time, back then, that knew Chris.  So I'm assuming that that

22   picture was given to him either directly by him, or that guy

23   gave it to someone else and then Chris got it, but it's unclear

24   to me how he got it and when.

25   THE COURT:  Okay.  Last question for you.  You -- it

UNITED STATES DISTRICT COURT

Victim 3 - Statement

1    says in here you visited with his father or family members

2    about this and told him what was going on.  Is that right?

3              VICTIM 3:  Yes.  After I identified it was Chris, I

4    contacted his brother first.  I sent him a message asking for

5    his father's phone number, because his father and I had been

6    close in the past when we were kids, when I was a kid.  So I

7    thought that maybe reaching out to him might help in some way.

8    So I did.  I called his father and had a conversation about it.

9    Nothing came of that.

10             THE COURT:  Do you know if his father or brother ever

11   addressed this directly with him, or do you know that, or did

12   they just forget about it?  Any idea?

13             VICTIM 3:  So after that day, I hadn't heard from any

14   of them, so I'm not sure exactly what happened at that point.

15   But I know that he -- his father told me that he was going to

16   take care of it and get help for Chris.  They both said they

17   knew this was an issue in the past and appreciated me coming to

18   them instead of going directly to the police.  So they did tell

19   me that they would take care of it.  I don't know what was done

20   after that point.

21             THE COURT:  All right.  That's all the questions I

22   have for you.  I appreciate you coming on Zoom like this.

23   Anyone have anything you'd like to address?  You can stay and

24   watch the whole thing, if you want.  We're going to mute you

25   after this, if there's nothing else.

Victim 3 - Statement

 1            MS. THELWELL:  Yes, Your Honor.

 2            I just wanted to clarify when you were reading your

 3    statement, I think you said back in 2006, I think you meant

 4    2016, because that's what you wrote.  But I just wanted to

 5    clarify.

 6            VICTIM 3:  Yeah.  I definitely wrote 2016.  And it

 7    was 2016.

 8            MS. THELWELL:  Okay.  Thank you.

 9            THE COURT:  All right.  Anything?

10            MR. BIEBER:  No.  No questions, Your Honor.

11            THE COURT:  All right.  So you can -- you can follow

12    along, if you want.  I think we'll take your picture down off

13    the side of the courtroom here, and we'll mute you.

14            Do we have anybody else on Zoom that wants to talk?

15    No?

16            MS. THELWELL:  I was told no.  But I also said that

17    this would be the last opportunity, in case they change their

18    mind.

19            THE COURT:  Okay.  Any Zoomers out there, if you'd

20    like to speak, do something now, wave your arms or something so

21    we can see you on Zoom.  I can't see the Zoom.  So is anybody

22    waving?

23            THE COURTROOM DEPUTY:  No, Your Honor.

24            THE COURT:  All right.  So let's go with the live

25    people next.  Right there is good.

                    UNITED STATES DISTRICT COURT

Victim 4 - Statement

1    WHEREUPON,

2                                  **VICTIM 4,**

3    was called as a witness and, after having been first duly

4    sworn, testified as follows:

5                                  **STATEMENT**

6              VICTIM 4:  Yes, sir.

7              THE COURT:  Okay.  Tell me who you are, please.

8              VICTIM 4:  ███████  ███████.

9              THE COURT:  Yeah.  See how I have it right in my

10   face.

11             VICTIM 4:  ███████  ███████.

12             THE COURT:  So you are -- are you one of the twins?

13             VICTIM 4:  I am.

14             THE COURT:  Are you the twin that's a lawyer?

15             VICTIM 4:  I am not.

16             THE COURT:  All right.  I don't know.  It didn't tell

17   me what you do for a living.  So that's how I have it in my

18   mind.  Twins and one's a lawyer.  All right.  So go ahead.

19             VICTIM 4:  Okay.  Your Honor, thank you for the

20   opportunity to make this statement today.

21             Today I speak to everyone listening, not as a victim,

22   but as ███████  ███████.  I've been dreaming of the day I could

23   seek justice since 2013 when an anonymous person, now known as

24   Christopher Buonocore, started targeting me by harassing,

25   stalking, blackmailing, and disseminating nude photographs as

                    UNITED STATES DISTRICT COURT

Victim 4 - Statement

1   well as nude photographs of me.  Never in my life could I

2   imagine the nightmare I would go through these last eight

3   years.  Christopher Buonocore's conduct has single-handedly

4   impacted me in ways I will most likely never even fully grasp,

5   let alone be able to articulate the pain he caused, but I'm

6   going to try my best.

7           I met Chris in college through my now brother-in-law

8   in 2008.  I was friendly with him, as I am with everyone,

9   especially people like Chris who don't necessarily fit in.  I

10  think it's important for my story to point out that my

11  relationship with Chris was always platonic and never crossed

12  over to any romantic or sexual context.

13          THE COURT:  One second now.  You are in college at

14  Florida Tech in Melbourne.  Is that right?

15          VICTIM 4:  Yes, that's correct.

16          THE COURT:  Are you from New York also?

17          VICTIM 4:  I am not.

18          THE COURT:  All right.  So you're from here?

19          VICTIM 4:  Yes.

20          THE COURT:  Go ahead.

21          VICTIM 4:  I would consider him an acquaintance at

22  best from college and nothing more.  Not that it makes his

23  actions any better, but I think society as a whole tends to

24  justify the terrors many men put women through as just

25  something that can happen when a man is upset with a breakup

Victim 4 - Statement

1   and seeks revenge.

2            To this day, I have no answers as to why he chose me

3   to torment.  There is no reason for revenge.  There was no

4   argument.  There was no fall out.  There was no reason for him

5   to want to hurt me whatsoever.  Any person in this room or

6   someone you love could have been his target and could

7   inevitably be his target in the future.

8            In 2013, I woke up to someone I knew from high school

9   alerting me that my nude body with my full name was all over

10  the Internet.

11           THE COURT:  Just a second now.  What years are you in

12  college with him?

13           VICTIM 4:  So I didn't go to college -- I went to

14  Florida Tech, but I wasn't at Florida Tech during that time.

15           THE COURT:  Well, whatever you were doing that would

16  be --

17           VICTIM 4:  I was at a neighboring community college,

18  and I was there --

19           THE COURT:  What is that, Valencia?

20           VICTIM 4:  So Melbourne is -- it's now called Eastern

21  Florida State.  It was ECC back then.

22           THE COURT:  What were the years?  Whatever school you

23  were at, what were the years?

24           VICTIM 4:  2008 to '10ish.  And then I moved away to

25  another college and then eventually came back to Florida Tech.

Victim 4 - Statement

1    But he was gone at that point.

2              THE COURT:  So when you first came into contact, it

3    was 2008, 2010ish?

4              VICTIM 4:  Yes.

5              THE COURT:  You don't have any contact with him again

6    until, you were just saying, 2015?  Is that where you were?

7              VICTIM 4:  2013.

8              THE COURT:  2013.  Okay.  What happens in 2013 now?

9    Go ahead.

10             VICTIM 4:  So I woke up to someone I knew from high

11   school alerting me that my nude body with my full name was all

12   over the Internet.  The images were stolen from a

13   photographer's online proof gallery and were nip slips from a

14   photo shoot that should have never seen the light of day.

15             THE COURT:  Okay.  Now, what does that mean?  I read

16   that.  I didn't have any idea what that meant.

17             VICTIM 4:  He stole photos from an online proof

18   gallery of a photographer.

19             THE COURT:  So that means like when you go to a

20   photographer, they -- instead of giving you proofs or pictures,

21   you go on a computer and you look at your pictures?

22             VICTIM 4:  Yes.  It's a software, essentially.

23             THE COURT:  All right.  And what -- what is a nip

24   slip?

25             VICTIM 4:  A nip slip is when your breast is exposed,

UNITED STATES DISTRICT COURT

Victim 4 - Statement

1    but in the original photo that might have seen the light of

2    day, it would not have not been exposed.  So when you're doing,

3    you know, a photo shoot where -- it's exactly how it sounds, it

4    slips out.

5            THE COURT:  I didn't think that's what it was.  I'm

6    learning something here.  As you can see, I'm a little more --

7            VICTIM 4:  Hang out with me, you'll learn a lot.

8            THE COURT:  I don't know.  I thought -- I was

9    thinking that that term was something like a photography term

10   or something.  So -- okay.  Go ahead.  Sorry.  Keep going.

11           VICTIM 4:  You're fine.  Thank you.

12           Christopher Buonocore went out of his way to obtain

13   these photos illegally and posted my bare body on the Internet

14   for all to see.  Soon after the images were publicly posted by

15   Christopher Buonocore, I started to be anonymously harassed,

16   mostly by Christopher himself, but he also recruited an army of

17   anonymous users to harass me and threaten me as well.

18           THE COURT:  One second.  One second.  Sorry.  You're

19   nervous because you're in court.  You're not used to being in

20   court, and you have no idea how fast you're talking.  So

21   consciously, as you read it, think slow.  All right?  Because

22   the court reporter, otherwise her fingers are going to shrivel

23   up and fall off.  So go ahead.  Keep going.

24           VICTIM 4:  Every day for the next seven years, the

25   life I loved became unrecognizable, and he would use these

Victim 4 - Statement

1    stolen photos to torment me.  This included posting my photos

2    along with my addresses, phone numbers, social media handles,

3    workplaces, and known family members for any creep to be able

4    to find me.  To this day, I still receive harassing messages.

5            If he caught wind I was getting close to someone,

6    they too would be a target.  This also included flooding my

7    public Facebook profile with nude photos, as well as calling,

8    e-mailing, and messaging not only me but my family, my clients,

9    my friends, and other people in my life incessantly.

10           My boss at the time has been called and harassed on

11   my behalf.  Chris has messaged images of my body to my clients.

12   He attempted to blackmail more nude photos.  The harassment was

13   so extensive that I had to change my phone number and social

14   media handles.  My nude photos would appear in the top of

15   Google search result when searching for my name, and he was

16   often seen bragging about this on the dark web, stating that he

17   does not feel bad for ruining my life.

18           THE COURT:  Okay.  Now stop right there.  I'm going

19   to ask the questions along the way.  It will be easier that

20   way.  It said that your boss and your client, so somebody was

21   sending pictures of you to your boss and your clients?

22           VICTIM 4:  Yes.  That's correct.

23           THE COURT:  What kind out of work?  What kind of --

24   what are you talking about?  Clients, like lawyer clients?

25           VICTIM 4:  So I'm in marketing.  I own my own

Victim 4 - Statement

1   company, so I have lots of clients that I --

2           THE COURT:  People that want to hire you to do

3   marketing?

4           VICTIM 4:  Marketing and advertising, yes.

5           THE COURT:  It says he attempted to blackmail more

6   nude photos.  Same question I had for the other person.  Did

7   you give anything -- did you give more photos, money, anything

8   like that?  What was the --

9           VICTIM 4:  No, I did not.  He -- my favorite

10  blackmail was he wanted gift cards, not cash.  Gift cards.  But

11  blackmailing for -- "Oh, I'm going to put this up at your bar

12  where all the college kids go, your nude photo everywhere if

13  you don't give me more photos."

14          THE COURT:  Did you give him more photos?

15          VICTIM 4:  No, I did not.

16          THE COURT:  All right.  Okay.  Keep going.

17          VICTIM 4:  His attacks were crowdsourced, and my

18  attackers were everywhere.  They could be anyone, and I didn't

19  know who they were.  For years, every single person I crossed

20  paths with in my life was a suspect.  Can you imagine living

21  life not being able to trust anyone in it?  Whether it was a

22  receptionist at my dentist, a stranger walking down the street

23  behind me, or my very best friend, they were all suspects.

24          The anonymity of the harassment meant I didn't know

25  who could be trusted.  The online nature of the attacks meant I

Victim 4 - Statement

1    had nowhere to turn.  Everywhere I did turn, Chris or his

2    recruits inevitably were there, one step ahead of me and

3    waiting to destroy me, my career, my professional

4    relationships, and income, my personal relationships, and most

5    likely to eventually physically hurt me.

6          Please think to yourself how many times during the

7    day your phone vibrates or makes a sound, alerting you about an

8    e-mail, a text, status update, or a phone call.  To this day,

9    every time my phone lights up or makes a sound or I receive a

10   call from an unknown number, my heart drops, and I am paralyzed

11   in fear because of each of these alerts triggers the memories

12   of pain caused by Christopher.

13         To this day, I still receive harassing messages due

14   to posts Christopher refuses to take down, because I quote you

15   directly from his attorney's mouth, "that it would take too

16   much time."  I'd also like to put on record that it would take

17   no more time to take down than it did to take up.

18         In 2018, Chris, unknowingly to me, convinced my

19   long-distance ex-boyfriend Jeffrey Geiger to send more photos

20   and videos that were much more graphic and sexual.

21         Around this time, they also started harassing my twin

22   sister Christine.  Just when I thought the fire might fizzle

23   out, Chris had fuel added to the fire, and the fire was

24   intensified.

25         THE COURT:  Okay.  Now, here's the part now, this

Victim 4 - Statement

1    Geiger, does he get charged in any of this?  Has he done

2    anything illegal here?  What's the story with him?

3                MS. THELWELL:  He's an unindicted coconspirator, Your

4    Honor.  We have not charged him.

5                THE COURT:  He was your boyfriend at the time you

6    were not a student at Florida, but living in Melbourne and

7    hanging around with people from Florida Tech?  He was your

8    boyfriend then?

9                VICTIM 4:  Yes.  Correct.

10               THE COURT:  And he had pictures of you, your

11   boyfriend did?

12               VICTIM 4:  Yes.  We were in a long distance

13   relationship.  He lived in Maine.

14               THE COURT:  Maine.  All right.  And how did -- was he

15   in Melbourne at some point?  How does he get hooked up with

16   Chris?  How did the two --

17               VICTIM 4:  That's something you would have to ask

18   Christopher, because I'm -- I'm a third party in that.  So I

19   don't know what their -- how they communicated or how he --

20   they never told me that information.

21               THE COURT:  Have you confronted Geiger about this?  I

22   mean, does he admit that it happened or --

23               VICTIM 4:  Yes.  He --

24               THE COURT:  -- are you assuming it happened?

25               VICTIM 4:  Geiger has admitted it.

UNITED STATES DISTRICT COURT

Victim 4 - Statement

1        THE COURT:  Okay.  All right.  Go ahead.

2        VICTIM 4:  Life is tough for all, but on top of

3   managing my workload for my career and other organizations that

4   I volunteer my time to, I struggled to keep from drowning

5   personally.  Every day I was actively trying to stay afloat,

6   grasping at a life float that wasn't there.  No one was there

7   to help me.  I tried asking my local police to help me, but I

8   was turned away.

9        There were days during this time that I didn't want

10  to get out of bed.  There were days that I didn't want to live.

11  I felt guilty for bringing my sister into this.  Some days I

12  thought my sister's life would be better without me in it.  And

13  then other days, she was the only thing keeping my fighting.

14  Chris single-handedly stole my joy and passion for life and the

15  people in it.

16        As a victim of this type of crime, the impacts caused

17  by Chris' actions will likely continue to come out throughout

18  my entire life, but one thing is certain, I will never be the

19  same.  I have spent more of my adult life being harassed and

20  stalked by Chris than I have lived free from his torment.  I

21  have spent thousands of hours investigating, taking down photos

22  with DMCAs, helping draft court documents, and other work that

23  I otherwise would not have been forced to do, and will never

24  get those hours back of my life.

25        Since Christopher started his harassment, he devoted

UNITED STATES DISTRICT COURT

Victim 4 - Statement

1    over eight years to destroying my life.  I have been affected

2    financially, mentally, and physically.  I have spent hundreds

3    of thousands of dollars standing up for and protecting myself,

4    starting with filing a civil case with my sister to open up

5    discovery to deanonymize Chris, to safeguarding my house and

6    everything in between.

7              To make my fear of safety an act of concern, in 2017,

8    my home was broken into it.  Although I can't prove that the

9    break-in was connected, I have to wonder if this person got my

10   address, information from Christopher's post, and constantly

11   fear that more people will break in due to my address, name,

12   and information being on the Internet in front of an endless

13   amount of people that could want to harm me.  Chris actively

14   bragged about knowing his victims are suffering, and that he

15   doesn't feel bad.

16             During these times, he was also affecting my income

17   by sending messages and nude photographs to clients and

18   colleagues.  The years of the past that have been a blur,

19   minimally sleeping between the late-night investigation

20   sessions and the night terrors of a faceless man hovering over

21   me at night that kept me up.

22             Due to lack of sleep, not only has my mental health

23   suffered, so has my physical health.  The chronic stress is

24   taking a toll on my body, and I'm producing too much cortisol

25   and prolactin, which are also known as the stress hormones.  I

Victim 4 - Statement

1    will forever have the stress in my life, and I will have to

2    fight physical health issues in addition to anxiety, panic

3    attacks, depression, and paranoia for the rest -- for the

4    remainder of my days on this earth.

5            My body has been picked apart by Internet trolls.  I

6    have had to sift through threads shaming every inch of my body

7    and sexuality, parts of my body I didn't even know I should be

8    self-conscious about.  These disseminated photographs and

9    videos will most likely continue to haunt me throughout my

10   entire life, and that humiliation cannot be undone.  I will be

11   forced to continue monitoring my online presence with

12   takedowns, costing me money, and affecting my mental and

13   physical health.  This is solely due to Christopher's actions.

14           THE COURT:  Stop right there.  One second.

15           Now, the pictures and stuff that you just explained

16   were being sent out to clients and colleagues.  I'm not totally

17   following the -- I don't know.  As lawyers, we would say

18   "causation."  It's like people are contacting you saying,

19   either do something, or we're going to do these photos, and

20   you're saying no, so the photos go out, or is it just people

21   are just -- or somebody, him, somebody is just putting photos

22   out there just to mess with you?

23           And I don't know if I'm asking -- is it -- are the

24   photos being put out there because you're not cooperating, or

25   are they just being out there to mess with you?

Victim 4 - Statement

1           VICTIM 4:  I think that he would have used -- I don't

2    think that this would have ever stopped.  People like Chris use

3    that as a way to try to ploy out more photos -- or pull out

4    more photos from people, and then they in turn use them to

5    harass them even more, if that makes sense.

6           THE COURT:  Yeah.  See, this is enlighting, because I

7    don't do any of this stuff.  I don't even have Facebook.  Try

8    to find me on Facebook.  You'll never do it.  I've never done

9    any of this stuff.  Now, I'm glad.  Many reasons, but I'm glad.

10   My point is, is it -- you said people try to get more photos.

11   So this is a common thing, like that -- that you're like -- I

12   mean, you have to deal with this with people just constantly

13   asking for photos?

14          VICTIM 4:  Yes.  Most of the time, it was Christopher

15   himself, but they post on the dark web, and it's essentially

16   like website forums.  And they will ask other creepy people to

17   help them harass certain people, so there are a subset of

18   people out there that will take those threats and do what the

19   person says.  And it's under the guise of being anonymous.

20   Fast-forward, it's not so anonymous.

21          THE COURT:  Right.

22          VICTIM 4:  We got him.

23          THE COURT:  You're not doing what they want you to

24   do, or are you?  I mean, what's --

25          VICTIM 4:  So no, I was not doing what they wanted me

                    UNITED STATES DISTRICT COURT

Victim 4 - Statement

1    to do, and the harassment continued.

2              THE COURT:  That's why there's more pictures, because

3    you're not doing what they wanted you to do, which was do new

4    pictures.  Not nude, new pictures.

5              VICTIM 4:  Even if I did what they wanted to do, they

6    would have just taken those photos and continued the

7    harassment.  They had an arsenal of additional weapons to use

8    against me essentially.

9              THE COURT:  Okay.  Go ahead.  Thank you.

10             VICTIM 4:  I have no doubt in my mind that

11   Christopher is going to come in here today and tell everyone

12   that he is deeply sorry for everything he has done, that he

13   learned his lesson.  And that, quite frankly, is bullshit.

14             THE COURT:  It's not a legal term, by the way, but go

15   ahead.

16             VICTIM 4:  Couldn't think of one good enough.  He

17   isn't sorry for what he did.  He is sorry he was stupid enough

18   to get caught.  He is sorry that myself and the five other

19   women standing up to him were strong enough to fight.  He may

20   be sorry that he's going to have to face the consequences of

21   his actions for the very first time in his life, but he is not

22   sorry for what he did.

23             To start, he has stated multiple times over the years

24   that he does not feel sorry for anyone he has harassed.  In

25   addition, this isn't an isolated incident.  In fact, two of the

UNITED STATES DISTRICT COURT

Victim 4 - Statement

1    victims here today on Zoom have previously caught him on the
2    same crimes five to seven years ago, but his brother John
3    Buonocore, along with his father, also named John Buonocore,
4    covered up his crimes multiple times, promising the victims
5    that they would get him help and beg them not to report to it
6    the authorities, including one who was underage when the photos
7    were taken.

8         If he was so apologetic, he would have stopped
9    harassing innocent women and children when he was initially
10   caught, but instead continued on to harass multiple other women
11   and children throughout the next eight years.

12        As mentioned earlier, there was also a civil case in
13   which we had asked him to provide information and evidence
14   multiple times as well as take down his posts, including our
15   full names, with no cooperation whatsoever.

16        His attorney Brian Bieber filed a laughable
17   sentencing memorandum in August on Buonocore's behalf, asking
18   for a below-Guideline sentence that I will gladly and easily
19   pick apart.  A below-Guideline sentence is requested because of
20   Buonocore's early acceptance of responsibility, unique family
21   circumstances, and the public and private embarrassment of a
22   felony conviction, and the negative impact the same will have
23   on Buonocore for the remainder of his life.

24        For starters, Buonocore may have had an early
25   acceptance of responsibility, per courtroom definition, once he

Victim 4 - Statement

1    was charged.  But prior to being criminally charged, he did

2    everything but acceptance of responsibility.  My sister and I

3    were attempting to deanonymize the anonymous stalker now known

4    as Christopher Buonocore.  And every step of the way,

5    Christopher fought the subpoenas and filed as many objections

6    as he could as John Doe, knowing that we were going to

7    eventually unmask him as the creep he truly is.  Does this

8    sound like someone that has accepted responsibility?

9             During this time, Brian Bieber, Brian McKenna, and

10   Peter Corley, all three different attorneys at three different

11   firms reached out to us.  Once officially deanonymized, Brian

12   Bieber reached out on Buonocore's behalf, all while Buonocore

13   was dodging service.  The day his answer was due to stay the

14   case, he filed bankruptcy.  Again, does this sound like someone

15   that has accepted responsibility?

16            He has had no intention of taking responsibility for

17   his actions until he was charged with a crime, and it was in

18   his best interest to check off the list of ways he can act

19   remorseful to sway your decision on sentencing and continue on

20   his path of dodging discipline for his actions.

21            Buonocore takes no responsibility for his actions and

22   is seen time and time again falling back on the excuse that his

23   mother's death when he was a child is the reason for every

24   mistake he makes.  He and his current family had a chance for

25   redemption all those years ago when two victims reached out to

Victim 4 - Statement

1   them for help.  Instead, they covered up his crimes, begging

2   the victims not to go to the authorities, proving that his

3   behavior is facilitated by the ones closest to him, and this

4   mental health plea is a ploy to get a lesser sentence now that

5   he is caught again.

6           Two of the victims already gave him a chance to work

7   on being a better person.  That didn't work.  Let's not let

8   history repeat itself.

9           I would like to move on to the public and private

10  embarrassment of a felony conviction and the negative impact

11  the same will have on Buonocore for the remainder of his life,

12  as I am genuinely appalled that Buonocore and his attorney

13  would even go there.

14          Let's talk about embarrassment.  Public embarrassment

15  is when your nude images come up on the top of Google search.

16  Public embarrassment is when Christopher Buonocore posted a

17  nude photo of you on your public Facebook profile in response

18  to a comment that one of your clients posted.  Public

19  embarrassment is literally the goal Christopher has had for

20  each of his victims every single day.

21          For the last eight years, I have not only been

22  humiliated, but have been incarcerated by Chris and his sick

23  games.  So, no, I do not nor do I think others should

24  necessarily feel pity or embarrassment a felony conviction

25  would hold on someone like Christopher Buonocore.

Victim 4 - Statement

1          I told myself one thing that kept me going all these

2    years, and that's, "███████, one day your pain will have a

3    purpose."  My pain can help pave the path for every victim to

4    come after me.

5          Today, Your Honor, you have the chance to acknowledge

6    that all of my pain has a purpose.  As much as this is very

7    much about me and the five girls standing up here today with

8    me, it's also very much about every single woman in this room,

9    women and children everywhere.

10         This is why I come here to have you consider the

11   maximum penalty sentence for Christopher Buonocore.  By doing

12   so, my pain will feel as if it had a purpose.  You will send

13   him and other abusers a message that they cannot get away

14   harassing innocent women.  We have the power to stop them,

15   starting right now by holding Chris Buonocore fully accountable

16   for his crimes by punishing him to the maximum extent of the

17   law.

18         I'd like to thank you again, Your Honor, for allowing

19   me to share my story today.  I'm only here today because of the

20   education, resources, and strong support that I possess, and I

21   would like to acknowledge that.

22         I am eternally grateful for each and every one of

23   people that helped me along the way.  I definitely wouldn't be

24   here without my twin sister ████████.  She graciously helped

25   me and in turn was hit in the crossfire.  I couldn't think of a

Victim 4 - Statement

 1  better partner to go to battle with.  Without her knowledge and

 2  education, we would not have made it this far.

 3          Thank you, Dana and John, for taking late-night

 4  shifts, scouring the Internet and piecing together clues with

 5  my sister and I.

 6          Thank you, Bill Lindsay, a New York legislator, who

 7  assisted us and personally escorted some of these victims to

 8  report this crime.

 9          Thank you, Paul Alfrey, the mayor of Melbourne, who

10  helped get my case seen by the Melbourne Police Department

11  after I was turned away multiple times over the years.

12          Thank you to the Loretta and Lynn, the FBI agents

13  assigned to our case, for not only saying, "I believe you," but

14  always going above and beyond, passionately fighting for each

15  and every one of us.

16          Thank you, Lisa, who prosecuted the case on the

17  behalf of the United States.  I couldn't have dreamt of a

18  better group of women to help us on our journey to justice.

19          And, lastly, I want to thank you every single victim

20  standing up here with me today, and it takes strength and guts

21  to do this.  The lone wolf dies, but the pack survives, and we

22  survived.

23          THE COURT:  All right.  Now, couple questions.

24          You said -- I think -- I'm trying to find out dates

25  here so I understand how this played out over time.  You were

Victim 4 - Statement

1  in college or hanging around Florida Techish, 2008, 2010ish.

2  2013 is when this stuff started?

3          VICTIM 4:  Yes, correct.

4          THE COURT:  You talked about eight years.  So it went

5  on from 2013 till when did it stop?

6          VICTIM 4:  I mean, it technically hasn't stopped.

7          THE COURT:  I mean, from him.  He got caught.  We

8  assume he stopped.  Maybe not, but we assume so.

9          VICTIM 4:  We're assuming that, yes.  It's a huge

10 assumption in my eyes, but we can assume that.  But some of his

11 posts are still out there, so I'm still getting harassing

12 messages to this day.

13         THE COURT:  Okay.  When do you think --

14         VICTIM 4:  Solely due to his actions by posting

15 those -- my information online.

16         THE COURT:  Right.  I understand that way of looking

17 at it, because once it's out there, it's out there.  That's

18 why, you know, political people say things, and, you know, it's

19 only the Internet forever, and they regret that they said it,

20 and it's brought up later when they want to become a federal

21 judge.  Somebody says, "Oh, you said this when you were in high

22 school."  So I get that idea.

23         But when did it stop in terms of you think -- if you

24 know, just your best guess of active harassment versus

25 something on the Internet that just keeps alive?

Victim 4 - Statement

1          VICTIM 4:  I mean, that's tough to say because of the

2    nature of the crime.  I would say probably when he -- the FBI

3    came knocking on his door, honestly.

4          THE COURT:  I don't know when that was.

5          VICTIM 4:  It didn't stop when we filed the civil

6    case, because he had his game plan for the civil case.  He was

7    just going to file bankruptcy, dodge it until, you know, he had

8    that.

9          THE COURT:  When was that?

10          VICTIM 4:  Lisa might have those dates.

11          THE COURT:  Just give me a guesstimate.  It

12    doesn't -- it can be within a year or two.

13          VICTIM 4:  I would say like two years, about two

14    years ago --

15          THE COURT:  Two years ago.

16          VICTIM 4:  -- I probably met with Loretta and Lynn,

17    the FBI agents.

18          THE COURT:  2019?

19          MR. BIEBER:  Your Honor, 2019.

20          THE COURT:  2019.  Good.  Okay.  All right.

21          So that's my -- now, the last question I had for you

22    is explain to me how this goes down.  I understand the stuff

23    with the nude pictures.  I get that.  But what's the -- well, I

24    don't -- I understand what you're saying.  I've not looked at

25    them.  Not saying I've looked at that stuff.  I understand what

Victim 4 - Statement

1    you're saying.  But what about the personal information?  How

2    does that get -- how does that get into this?

3                VICTIM 4:  They use that as a way to humiliate

4    victims even more.  So they will post all of your identifying

5    information.  He went as far as putting a collage together of

6    all of my known family members, their social media handles,

7    their e-mail addresses, their phone numbers, my address.

8                THE COURT:  Your home address?

9                VICTIM 4:  Yes.  Literally anything that someone

10   could find you very easily at, he actually made a collage.

11               THE COURT:  A collage?

12               VICTIM 4:  A collage of photos of me, along with

13   information that someone could find me or find people that love

14   me or I love them.

15               THE COURT:  E-mail addresses and physical home

16   locations.

17               VICTIM 4:  Phone numbers, social media handles,

18   addresses, known family members.

19               THE COURT:  Not only of you, but of family members?

20               VICTIM 4:  Yes, sir.

21               THE COURT:  All right.  Okay.  Any other questions

22   for her besides what I've covered?  Anything?

23               MS. THELWELL:  No, Your Honor.  Thank you.

24               MR. BIEBER:  No, Your Honor.

25               THE COURT:  All right.

Victim 5 - Statement

1          VICTIM 4:  Thank you, Your Honor.

2          THE COURT:  Thank you.  Thank you.

3          Who's next?  Come on down.

4   WHEREUPON,

5                          **VICTIM 5,**

6   was called as a witness and, after having been first duly

7   sworn, testified as follows:

8                          **STATEMENT**

9          THE COURT:  Tell us your name.

10         VICTIM 5:  ███████  ███████.

11         THE COURT:  You're a twin?

12         VICTIM 5:  Yes.

13         THE COURT:  And you're the lawyer?

14         VICTIM 5:  Yes.

15         THE COURT:  Got it.  Go ahead.  By the way, where do

16  you practice law?  Here?

17         VICTIM 5:  Sarasota, Florida.

18         THE COURT:  What kind of law to you do?

19         VICTIM 5:  Local government law.

20         THE COURT:  Never come into federal court.  Right?

21         VICTIM 5:  I personally do not.  My office does.  I'm

22  actually sworn into this court for the civil case, though.

23  Occasionally, but I was in Orlando.

24         THE COURT:  Most people don't like coming up here

25  from Sarasota.

                    UNITED STATES DISTRICT COURT

Victim 5 - Statement

1          VICTIM 5:  I can imagine.  The drive was not fun this

2     morning.

3          THE COURT:  Go ahead.

4          VICTIM 5:  Good afternoon, Your Honor.  Thank you for

5     the opportunity to speak today regarding the impact of Chris

6     Buonocore's criminal actions on me and the other victims.

7          In his sentencing memorandum, Christopher requests a

8     reasonable sentence, urging the Court for a variance downward

9     from the Sentencing Guidelines.  He argues that this Court

10    should make an individualized assessment based on the facts

11    presented.  I agree.  The Court should listen to the victims

12    today and determine, based on the individual facts, that the

13    actions Christopher has engaged in warrant the maximum-allowed

14    penalty.

15         Christopher was charged with and pled guilty to six

16    counts of cyberstalking.  When you see the charges on the page,

17    it doesn't fully explain the story.  I'm here to explain these

18    charges in context and urge you to sentence Christopher with

19    the maximum allowable penalty for six counts of federal

20    cyberstalking.  Though cyberstalking was the federal charge

21    most prosecutable by the federal government, what he did was

22    not simply cyberstalking.  Further explanation is needed to

23    fully understand the severity of his actions and the effect on

24    these five women and a minor.

25         When you think of cyberstalking, you don't

Victim 5 - Statement

1   necessarily think of the acts that Christopher actually engaged

2   in.  Christopher purposely and maliciously attacked us daily

3   for years while hiding behind a computer screen.  He thought he

4   was invincible and that his true identity could not be

5   discovered.  In all cases, he posted photographs of us, clothed

6   and unclothed, in order to recruit a small army of anonymous

7   users to harass, blackmail, and threaten us.

8           THE COURT:  Let me interrupt you there.  The a small

9   army of anonymous users.  I read that.  Do you think that those

10  are real people, or are they him using fake Internet addresses?

11  What's going on with that?

12          VICTIM 5:  Both.  And the reason I know that is

13  because through the civil case, I was able to get subpoenas on

14  some of them, and some of them were other people, some of them

15  were him.

16          THE COURT:  And what's going on with that?  These are

17  people that are out there on the Internet?  I mean, this is the

18  same conversation I just had with your sister.  I mean, I don't

19  do any of this stuff, so I don't get it.  These are people on

20  the Internet that are just deciding that they want to spend

21  their time getting people's personal information or nude

22  photographs?

23          VICTIM 5:  Yes.  Some might call them degenerates.

24          THE COURT:  But they just do this to -- for something

25  to do?  I mean, do they have any connection with the people or

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1    you or anything?

2             VICTIM 5:  Generally not.  How I described it, I

3    think, to Loretta and Lynn at the time, it's -- I'm probably

4    dating myself here.  It's like Pokemon cards.  They --

5             THE COURT:  I don't know what that is either.

6             VICTIM 5:  Okay.  It's baseball cards.  It's a game

7    to get these women, trade for other photos.  You humiliate this

8    ex-girlfriend of mine, and I'll humiliate this person for you.

9    It's a sick game that they play.

10            THE COURT:  Is it like a website where people go to?

11            VICTIM 5:  Yes.

12            THE COURT:  A specific website?

13            VICTIM 5:  Yes.  There's several.  The main one was

14   4chan.  It's an archive web forum.  And there's subcategories

15   where you can -- there's very bad things on there.

16            THE COURT:  So the people that are doing this don't

17   even know each other.  It's all on the Internet.  It could be

18   somebody in --

19            VICTIM 5:  Most likely they don't know each other.

20            THE COURT:  Yeah.  All right.  Go ahead.

21            VICTIM 5:  So these posts would include our names,

22   addresses, phone numbers, links to our social media accounts,

23   and other personal information.  Like my sister said, my sister

24   and I personally had to change our telephone numbers as well as

25   our social media handles due to this harassment.  He would

1   flood each victim's social media pages as well as incessantly

2   call, e-mail, and message us and our family and coworkers.

3           He would urge other anonymous users to punish us,

4   expose us, or rape us.  In many instances, he did this

5   attempting to blackmail nude photographs from his victims by

6   threatening to release more photographs to family members and

7   coworkers.  In some instances, he followed through with these

8   threats and distributed nude photographs to people closest to

9   us, our mothers, fathers, siblings, husbands, boyfriends, and

10  bosses received nude photographs of us.

11          THE COURT:  Hold on.  Hold on.  So that's -- that's

12  an absolute undisputed fact that you just said your mother,

13  father, boyfriends, all got photos of you.

14          VICTIM 5:  Definitely my sister.  I was actually one

15  of the people that received the messages from those anonymous

16  people.  I don't know if it was him or an anonymous army of

17  people --

18          THE COURT:  Okay.

19          VICTIM 5:  -- otherwise --

20          THE COURT:  Go ahead.

21          VICTIM 5:  -- it's hard to tell the identity, as you

22  know.

23          So in the case of Christopher Buonocore, we aren't

24  just talking about a casual post here and there.  We are

25  talking about thousands of posts, sometimes hundreds a day.

Victim 5 - Statement

1    The harassment was so extensive that the nude photographs would

2    appear at the top of the Google search result when searching

3    names, which culminated in one victim attempting to take her

4    own life.  He then proceeded to brag about his actions causing

5    her to be suicidal in another post.

6           Because there is no federal law for sexual cyber

7    harassment or nonconsensual pornography, law enforcement had to

8    rely on cyberstalking laws.

9           One of the victims is a minor.  Though he tried his

10   best to obtain them, thankfully none of the photographs

11   distributed of this underage victim were nude.  Because of

12   this, he was only charged with one count of cyber harassment.

13   These photographs of his 15-year-old cousin in her school

14   uniform were blasted all over the Internet with calls of

15   actions to rape her with one anonymous user offering to do the

16   deed for a fee.

17          These conversations were then moved over to the

18   platform Kik, K-i-k, where we can only imagine what information

19   was shared regarding these offers of rape and harm.  He also

20   solicited other users to photoshop photographs of his underaged

21   victim so that she appeared to be nude in them.  What

22   Christopher Buonocore did was not just your garden-variety

23   cyberstalking.

24          Another one of his victims was his fiancee, proving

25   that no female was off limits.  Some of these photographs of

Victim 5 - Statement

1   her nude body were taken by Christopher without her knowledge.

2   Again, he was only charged with one count of cyberstalking.

3   One of the victims, an ex-girlfriend attempted suicide due to

4   the incessant and flood of harassing and threatening calls,

5   e-mails, messages to her, her family, friends, and coworkers.

6   For this, he was charged with one count of cyberstalking.

7       One of the victims, who is now an adult, was a minor

8   in the photos he distributed over and over again.  Because only

9   her bare breasts were in the photographs and not her vagina, he

10  was not charged with child pornography and, instead, was

11  charged with one count of cyber harassment.

12      Although I believe certain people can change, I don't

13  believe Christopher Buonocore will ever change.  A true

14  testament of one's character is how they act when they think no

15  one is looking.  When Christopher thought no one was watching,

16  he bragged about his actions, stating, and I quote, "I exposed

17  two of my friends on 4chan, dot dot dot.  Their nudes have been

18  spread so much, you can Google their names and find nudes, dot

19  dot dot.  They had to change their phone numbers and lock down

20  all their social media, dot dot dot.  I don't feel bad, dot dot

21  dot."

22      Does this sound like someone who is going to change

23  and should be given the benefit of the doubt?

24      Christopher is going to plead to the Court and argue

25  that he is a changed man.  He is going to argue through counsel

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1    that he is remorseful and doing everything humanly possible to

2    right the wrongs of his past.  Christopher further urges the

3    Court for leniency based on his early acceptance of

4    responsibility.  This is just simply not true.  He is going

5    through the motions to appear remorseful to receive a lighter

6    sentence.

7           Prior to being charged, I used my skills as an

8    attorney, licensed in the state of Florida, to file a civil

9    lawsuit to obtain subpoenas to deanonymize our anonymous

10   stalker.  Christopher, as John Doe, fought me every step of the

11   way.  He filed objections as John Doe to stop the release of

12   subpoena results.  He had another attorney reach out to me on

13   behalf of this John Doe to stop the release of his identity.

14          THE COURT:  Can I interrupt you?  What is that?  I've

15   never heard of these John Doe cases.  How does a person file

16   objections without saying who they are?

17          VICTIM 5:  So I actually had to ask the court -- we

18   had to ask the court in order to even file a John Doe suit.

19   But that opens up discovery.  And then we are able to get

20   subpoenas.  And there's two layers of subpoenas for getting an

21   Internet subscriber.  So if you're connected to a static land

22   line on the Internet, it will go directly to your name.  If

23   you're on a cell phone, you have to go to the ISP in order to

24   get the subscriber information.  And due to the Communications

25   Act, it's a two-step process in which alerts the court and

Victim 5 - Statement

1    gives them the opportunity to quash the subpoena or object.

2              THE COURT:  Without saying who they are?  People

3    moving to quash subpoenas without saying who they are?

4              VICTIM 5:  Yeah.  I mean, I argued that, and it

5    wasn't well received.  But, yeah, the court accepted that.

6              THE COURT:  Who was the judge?

7              VICTIM 5:  It was a magistrate judge.  Gosh, I don't

8    remember.

9              THE COURT:  It was a federal case?

10             VICTIM 5:  Yes, Orlando.

11             THE COURT:  Okay.  All right.  Keep going.

12             VICTIM 5:  So he went deanonymized, had his current

13   defense attorney reach out to me, all while dodging service.

14   He did everything in his power to avoid being caught, all while

15   increasing my costs, time, and emotional damage.

16             Again, does this sound like someone who is

17   remorseful, or does it sound like someone who continued to

18   wreak havoc on the lives of innocent women and girls not

19   realizing that there was an impending criminal charge.  He had

20   no interest in owning up to his mistakes and righting his

21   wrongs until he was charged with a crime.  Now, it's in his

22   best interest to act remorseful and sway your decision.

23             He, upon finally being served in the civil case after

24   dodging service and fighting the release of his identity, filed

25   bankruptcy the day his answer was due to stay the case.

Victim 5 - Statement

1              Again, does this sound like someone who was accepting

2    responsibility, or was it in his best interest to accept

3    responsibility early for the criminal case once he realized he

4    was being charged with a federal crime?

5              Prior to being charged, Brian Bieber, Christopher's

6    defense counsel, reached out to me.  Upon my request, he

7    refused to take down his online harassment posts, citing that

8    he and his client thought it was too burdensome.

9    Interestingly, it was not too burdensome for his client to post

10   the thousands of nude photographs, threats, and other material

11   aimed to torment his victims.

12             Upon his arrest, I reached out to Bieber again,

13   hoping that maybe he had a change of heart, being that

14   cooperation would look good for his sentencing.  Brian Bieber

15   verbally attacked my morals and character.  Even after spending

16   time and effort to provide Bieber a step-by-step instruction

17   guide to get the posts removed due to his inability to

18   comprehend the concept himself, thousands of posts and photos

19   remain online, even though Brian Bieber assures the press and

20   the court that Christopher Buonocore is doing everything

21   humanly possible to right his wrongs.  He has yet to take down

22   the posts on the dark web containing the photographs and the

23   victims' locations.

24             Since his arrest, his counsel has changed his

25   position, stating that he will cooperate only with law

Victim 5 - Statement

1    enforcement, all while attacking me, a victim in the case.  To

2    date, Christopher hasn't even made the effort to contact the

3    sites or request his posts be taken down.  He boasts in his

4    sentencing memorandum that he got approximately 700 photographs

5    removed.  The exact post that he assures this Court that he has

6    removed still contained ███████'s full name and contact

7    information with only the photographs blocked out.  For all

8    other thousands and thousands of posts, nude bodies are still

9    on the Internet for all the world to see, and his words urging

10   others to harm us remain, yet we are bragging about removing a

11   handful of photographs in the grand scheme.

12           I personally would really like to see any evidence of

13   him doing anything to attempt to remove these posts.  I

14   personally have gotten thousands of photographs removed using

15   copyright law DMCA, and I have had many conversations with the

16   webmaster of 4chan who stated that Buonocore could get the

17   photographs and posts removed, especially setting this criminal

18   case.  As always, the burden is on the victims to spend the

19   time and money to do this because Christopher refuses to take

20   responsibility for his actions and --

21           THE COURT:  Time out.  Time out.  Let me just -- I

22   want to say something about that, the point you just made,

23   because I've been wondering about that.

24           And that's really my question for the prosecutor.  Is

25   there some -- why can't I sign an order directing these people,

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1    "Take it down or you're in contempt of court"?  Let them file

2    an appeal on that.  What's -- why would that not be part of the

3    remedy in this case?

4              MS. THELWELL:  I don't think that it cannot be a part

5    of the remedy.  I think that that would be a lawful order by

6    the Court.  I'm not sure of a reason why it couldn't be.  I

7    haven't researched the issue, but it sounds like it could be a

8    part of the Court's order in the sentence in this case.

9              THE COURT:  I mean, as far as I'm concerned, if

10   somebody says, "This is my picture, and I don't want it on the

11   Internet," and somebody -- some Big Tech, you know, Internet

12   company says, oh, well, there's nothing we can do about that

13   because somebody else posted it, I think that that's in the

14   category of the legal term that her sister used, and I think

15   that needs to be fixed.  So you should look into that.

16             MS. THELWELL:  Yes, Your Honor, I will.

17             THE COURT:  Go ahead.

18             VICTIM 5:  Okay.  So, additionally, Brian Bieber, as

19   agent for Christopher Buonocore, has released statements

20   presumably at his client's request, or at a minimum with his

21   permission, to local reporters to suddenly reveal the victims'

22   identity.  Not only is this dangerous for our safety,

23   considering Christopher using an anonymous army to stalk and

24   harass us, it is aimed to revictimize us and to punish us for

25   speaking out against his client.

Victim 5 - Statement

1          Again, I ask you, does that sound like a changed man

2   and someone that should be given the benefit of the doubt?

3          Since originally writing and submitting my impact

4   statement, Christopher has written us apology letters and

5   submitted documents, such as the sentencing memorandum.

6          Christopher claims in his sentencing memorandum that

7   he is remorseful.  Until the days leading up to the sentencing

8   hearing, originally scheduled, there were no apologies offered.

9   Once his attorney advised him to write us an apology letter to

10  look better to the Court, we received one-paragraph letters

11  that were supposedly intended to be apology letters.  This is

12  the guy who spent hours posting calls to harass and harm us on

13  the Internet, using that same keyword that he presumably typed

14  these apology letter with.  And this is the apology we got, a

15  one-paragraph essay refusing to take responsibility and

16  shifting blame for his actions.  It's laughable really.

17         This letter, which is virtually identical to every

18  other victim's doesn't even fit the description or definition

19  of an apology.  He fails to admit any wrongdoing and shifts

20  blame to the victims in each of these letters.

21         Christopher's also going to blame his actions on

22  psychological issues.  He claims in his sentencing memorandum

23  in requests for a reasonable sentence that he is not likely to

24  recidivate.

25         In the sentencing memorandum, Christopher asserts

Victim 5 - Statement

 1    that he has led an exemplary and law-abiding life.  These

 2    statements are patently false.  He has been committing this

 3    crime repeatedly just outside of the criminal system.  When two

 4    of the victims found out and confronted him years ago,

 5    separately at different times, he had the same story, that he

 6    was sorry, and that he would seek therapy.

 7            His father and brother, creatively both named John

 8    Buonocore, knew the online harassment, covered it up, and then

 9    convinced these victims not to come forward.  By my count, he

10    has recidivated three times.  He has had two separate wake-up

11    calls to stop this behavior and hasn't.  How many chances are

12    we willing to give this monster before somebody is actually

13    raped or murdered?

14            During his plea hearing, he admitted that he's never

15    received any diagnoses and experienced self-diagnosed anxiety.

16    He is now claiming psychological issues, only because he has

17    been caught.  He is not taking responsibility for his actions

18    in any way, and he is now hiding behind an imaginary and

19    unverifiable medical condition instead of a computer screen.

20            Christopher further urges the Court for leniency

21    based on public and private embarrassment of a felony

22    conviction and the negative impact the same will have on

23    Christopher for the remainder of his life, stating these are

24    reasons for the Court to impose a below-Guideline sentence.

25            The victims that you hear from today are the ones who

Victim 5 - Statement

1    will sustain public and private embarrassment and negative

2    effects on their professional and personal lives for the rest

3    of their lives due to no criminal act they performed.  They are

4    being punished simply for being a victim of the disgusting

5    excuse for a human being who actually has the audacity to argue

6    leniency based on the negative impact it will have on his life.

7            I personally have spent hundreds of hours and

8    thousands of dollars deanonymizing Christopher and getting his

9    post taken down.  It started with assisting my sister in about

10   2013 when she was being harassed nonstop.

11           Not surprisingly, when you don't know who exactly is

12   harassing you, law-enforcement officers aren't too willing to

13   help.  I tried to help her report this crime, armed with the

14   law, and even e-mailed her local authorities after she was

15   turned away.  It wasn't until he started posting about me

16   several years later that I realized exactly how difficult it

17   was to report this incredibly painful crime.  After hours of

18   researching, pulling subpoenas, and deanonymizing Christopher,

19   I contacted all the victims so we could stand together and

20   report this degenerate.

21           When it came time for me to report what had happened

22   to me, I learned what it meant to be revictimized.  This isn't

23   illegal.  A jury is not going to understand this.  Well, how

24   did they get the photos?  It's only a misdemeanor.  Six of us

25   walked into six different police stations across the country

Victim 5 - Statement

1    and in an act of support and unity.  Each victim was prepared

2    with a summary, talking points up, and a concise outline of

3    exactly what was illegal about this, and even the name and

4    location of our anonymous tormentor.  Only two came out with

5    police reports that day.

6          I am a lawyer, armed with the law, confident in my

7    abilities to communicate, and I had to beg to file a police

8    report.  I eventually convinced the police officer at the

9    station to file the report and let the detective decide whether

10   this was a crime or not.

11         Luckily, my detective recognized that this was a

12   crime and forwarded my case to the FBI.  One out of six police

13   stations did the right thing.  Luckily for the other five

14   victims, our cases were linked together.  I often think about

15   how many other girls and women are dealing with this with no

16   means to advocate for themselves.

17         To those who finally listened, I want to say

18   thank you.  Thank you to my husband, Dana, for standing by my

19   side.

20         Thank you for John Kenny for all the online

21   sleuthing.

22         Thank you for my friends.  Katie came today.

23         Thank you to Bill Lindsey, New York legislator, who

24   used his power for good and devoted his time to assist us.  He

25   even personally escorted some of these victims to report this

Victim 5 - Statement

1   crime when we were turned away or scared.

2          Thank you to any law-enforcement officer who looked

3   us in the eyes and said, "I believe you."

4          And thank you to the FBI agents who worked on this

5   case.  Loretta and Lynn poured their hearts into this case, and

6   I truly, truly appreciate it.

7          And, lastly, thank you to Lisa who prosecuted this

8   case on behalf of the United States.  How poetic that a team of

9   all women brought you to justice, Christopher.

10         Your Honor, when you consider a sentence today, I ask

11  that you put yourself in our shoes.  Imagine your phone number,

12  home address, and contact information being posted on a public

13  forum with calls to stalk and harm you.  Imagine your nude body

14  being sent to everyone you care about, your friends, your

15  family, your coworkers.  Now, imagine trying to stop your

16  attacker and being scoffed at by law enforcement and sent home

17  to continue to bear the harassment for several more years.

18  This is the story of all these six women and girls.

19         Today, I speak to you as ██████  ██████, not

20  Victim 5.  I think it's hard for people to remember that there

21  are real people associated with these vicious attacks.  We are

22  people who have experienced something that has forever changed

23  their lives.

24         I was attacked by Christopher Buonocore simply for

25  trying to assist his main target, my twin sister.  We aren't

Victim 5 - Statement

 1   even really sure why he targeted us.  Neither of with us dated

 2   Christopher Buonocore.  We were nothing but nice to him in

 3   college.  In college, he was an outcast, and we were friendly

 4   and nice to him.  He was even at my wedding.  He was a

 5   fraternity brother of my husband, my now husband, all while

 6   continuing to torment me and my sister over the years.

 7          I often think what we could have possibly done to

 8   deserve this, and the answer is nothing.  I often have to

 9   remind myself that he targeted us for no apparent reason, and

10   it could have been anyone.  He picked out his prey, not because

11   we were mean or were flirtatious or anything in between.  He

12   attacked us because he's the problem.  For me, this doesn't end

13   today.  This will be a constant threat hanging over my head for

14   my entire life.

15          THE COURT:  Hold on just a second.  Go back to right

16   where you were.  So this all gets started when you're a student

17   at Florida Tech.

18          VICTIM 5:  I met him Florida Tech through my now

19   husband.

20          THE COURT:  Your now husband was in the what, TKE

21   fraternity?

22          VICTIM 5:  Correct.

23          THE COURT:  And they knew each other in the

24   fraternity -- or they were in the fraternity, maybe they

25   weren't friends, but they were both in the same fraternity.

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1    And then you as your husband's then girlfriend meets him as

2    another guy in the fraternity?

3              VICTIM 5:  Correct.

4              THE COURT:  And then somehow or another, your sister,

5    who's living -- she's the same age, because she's a twin,

6    obviously.

7              VICTIM 5:  Yeah.  So we would all hang out, you know,

8    for fraternity events.  I was in a sorority, you know, the

9    whole college hangout.

10             THE COURT:  That's where the connection starts.

11             VICTIM 5:  Correct.

12             THE COURT:  And you didn't have any contact with him

13   after -- you said he was at your wedding.  Is he at your

14   wedding because he's your husband's buddy from the fraternity?

15             VICTIM 5:  Correct.

16             THE COURT:  Do you have contact with him after that?

17             VICTIM 5:  No.

18             THE COURT:  What was the date -- I'm not trying to

19   pry into your personal business.  But the wedding was the last

20   time you would have had any legitimate contact with him?

21             VICTIM 5:  Yes.  And you're quizzing me on my wedding

22   anniversary in front of my husband.

23             THE COURT:  You don't know.  It's usually the other

24   way around.

25             VICTIM 5:  March 7th, 2017.

Victim 5 - Statement

1          THE COURT:  2017.  Okay.  2017.  And then you started

2     to have stuff -- stuff is happening to your sister at that very

3     moment, though, right, according to what she said.

4          VICTIM 5:  Yes.  So in my mind, I visualize him

5     literally in the bathroom of my wedding also stalking --

6          THE COURT:  What did you say?  I didn't understand.

7          VICTIM 5:  In my mind, I envision him literally

8     harassing my sister in the bathroom of our wedding.  The time

9     line is all accurate.

10         THE COURT:  Okay.  And so did stuff start happening

11    to you when?

12         VICTIM 5:  So that would be -- he started posting,

13    you know, just grabbing photos from Facebook in 2017, you know,

14    just, you know, Facebook profile pictures, saying, "Twins.

15    Anyone have nudes?  Hit me up.  Harass these girls."  That sort

16    of thing in 2017.  2018 is when he posted a photo of my bare

17    breasts.

18         THE COURT:  And where did that -- how did that

19    come -- I thought it was her boyfriend had pictures.

20         VICTIM 5:  Yeah.  So he -- he -- I shouldn't use --

21    Jeffrey Geiger, my sister's now ex-boyfriend, stole photos out

22    of my Dropbox account, having access to her computer.

23         THE COURT:  So he goes on his then girlfriend's

24    computer and gets pictures of his girlfriend's twin sister that

25    he then gives over to the defendant.

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1           VICTIM 5:  Correct.  I'm assuming that's the time

2    line.  Again, you'd have to ask Chris about the details of

3    that.

4           THE COURT:  All right.  Go ahead.

5           VICTIM 5:  So for me, this doesn't end today.  This

6    will be a constant threat hanging over my head for my entire

7    life.  I will constantly fear the day that these photographs

8    will resurface.  I will constantly search the Internet for

9    photographs of myself to send copyright claims when they do

10   resurface, as it is my only defense.  This isn't an if for us;

11   it's a when.

12          I will constantly wonder if my boss is giving me a

13   weird look because he was sent a photograph of my breasts.  I

14   will wake up daily thinking is this the day I get fired because

15   a photograph of my breasts was sent to my place of employment?

16          I may not have been as viciously attacked as the

17   other victims, including my twin sister, but the long lasting

18   effects on my life are irreparable.

19          Due to law enforcement refusing to use their subpoena

20   powers or even letting us file police reports in the beginning,

21   I had to file a civil lawsuit against John Doe to obtain

22   subpoenas to deanonymize this person.

23          Due to this court denying my request to proceed

24   unanimously, there's a paper trail that leaves me with a

25   scarlet letter for any job that I apply for and any new

Victim 5 - Statement

1   personal or professional relationships I develop.  When you

2   Google our names and the civil case pops up, these posts are

3   discovered, and there's a societal assumption I did something

4   to deserve this, and I'm unfit for the position I apply for.

5          To give you an example, I recently had a job

6   interview for an in-house counsel position for a large soda

7   company that would have provided me about a $50,000 raise.  I

8   all but had the job until a background check.  I'm not

9   accepting a new job this month due to circumstances outside my

10  control that have nothing to do with my ability to do my job.

11  Due to the nature of his crimes, I will never be sitting on

12  that bench as a judge solely due to Christopher Buonocore.  As

13  Katie Hill taught us, I will never been a congresswoman because

14  of Christopher Buonocore.  In fact, I will never be able to get

15  a new job anywhere.

16         Providing leniency to Christopher Buonocore due to

17  the impacts his actions will have on his reputation and future

18  is a slap on the face of the sacrifices I made to bring him to

19  justice.

20         When this court refused to let me proceed anonymously

21  to deanonymize Christopher Buonocore, I sacrificed my

22  reputation, future, and career path to ensure he's

23  appropriately punished appropriately.  Please don't let this

24  sacrifice be in vain.

25         Christopher Buonocore took away my breath, my

Victim 5 - Statement

```
 1   privacy, my reputation, my time, my safety, my confidence, and
 2   my own voice until today.  Today, we stood together, and we
 3   faced him.  We look him in the eyes, knowing there is nothing
 4   wrong with us.  He is the one that is wrong.  Hopefully, one
 5   day society will recognize that too.  This is a shift that can
 6   begin today here in this courtroom.  It is for this reason and
 7   so many others that I ask you to consider the maximum-allowable
 8   sentence for Christopher Buonocore.
 9            THE COURT:  Okay.  Any questions?
10            MR. BIEBER:  No, Your Honor.
11            MS. THELWELL:  No, Your Honor.  Thank you.
12            THE COURT:  Are there other people that want to talk?
13            MS. THELWELL:  No, Your Honor.
14            THE COURT:  You just said, yes, no?
15            MS. THELWELL:  No.  I said no, Your Honor.
16            THE COURT:  Oh, I thought you said I don't know.
17   That's a good time for a break.  Let's take a five-minute
18   break, and then we'll see where we are.  All right.  See you in
19   five.
20       (Recess from 3:47 p.m. to 3:55 p.m.)
21            THE COURT SECURITY OFFICER:  Please remain seated.
22   Court is back in session.
23            THE COURT:  All right.  So that's it from the
24   plaintiff -- or prosecution side of things in terms of
25   witnesses?
```

UNITED STATES DISTRICT COURT

Victim 5 - Statement

1              MS. THELWELL:  Yes, Your Honor.

2              THE COURT:  Why don't we go and do the defense.  Who

3  do you have?

4              MR. BIEBER:  I just have witness-wise his father and

5  his aunt, brief character witnesses.

6              THE COURT:  Does he want to talk?

7              MR. BIEBER:  Yes.

8              THE COURT:  Let's do that.  Let's get all the witness

9  testimony out, and then we'll talk about where we are --

10             MR. BIEBER:  Okay.

11             THE COURT:  -- with all the rest of this stuff.

12             MR. BIEBER:  All right.  I think I'll address, as an

13  attorney, what was said about me appropriately at the

14  appropriate time.

15             THE COURT:  I don't think you need to worry about

16  that part.

17             MR. BIEBER:  I don't.  But I'm in federal court in

18  front of a United States District Court judge, and --

19             THE COURT:  That's who's in federal court.

20             MR. BIEBER:  I know, Judge, but --

21             THE COURT:  Whatever you want to do, but just go

22  ahead and do it.

23             MR. BIEBER:  Okay.  Let's -- let's proceed then with

24  our witnesses first.  Frances Bennett, who is the defendant's

25  aunt.

Frances Bennett - Statement

1          THE COURT:  Aunt.  She sent the letter.

2          MR. BIEBER:  Yes.

3          THE COURT:  Come on down.

4          MR. BIEBER:  She would like to address the court

5    briefly.

6    WHEREUPON,

7                          **FRANCES BENNETT,**

8    was called as a witness and, after having been first duly

9    sworn, testified as follows:

10                           **STATEMENT**

11         THE COURT:  Tell us your name, please.

12         MS. BENNETT:  My name is Frances Bennett.

13         THE COURT:  All right.  And I know you wrote a

14   letter, which I read.  But go ahead, if you want to read it

15   again, you can, or you can say something else.

16         MS. BENNETT:  It's a little different -- it has some

17   other information as well.

18         Thank you, Your Honor, for this opportunity.  As

19   Christopher Buonocore's aunt, I have a unique perspective in

20   witnessing the events that have impacted my nephew and the many

21   ways he has tried to overcome some of the major hardships he

22   has endured at a very young age.

23         Chris' mom, Marie, who was my sister, was diagnosed

24   with late-stage breast cancer when Chris was eight years old

25   and passed away when he was 12 years old.  Wanting to protect

UNITED STATES DISTRICT COURT

Frances Bennett - Statement

1    her children, Marie tried her best to hide the seriousness of

2    her illness.

3              Just recently Christopher shared with me that he

4    didn't know that his mom was going to die.  Because no one

5    prepared him for her death, and he was so young, he didn't know

6    how to cope with the pain.

7              As an educator and school principal for 30 years, I

8    have witnessed the trauma that a mother's death can have on a

9    young child.

10             THE COURT:  What level?  Elementary school?

11             MS. BENNETT:  Yes.  I was an elementary school

12   principal.

13             Now, I'm lost.

14             THE COURT:  Sorry.  You're the principal.  You should

15   be able to do that just fine.  Sorry.

16             MS. BENNETT:  I witnessed the trauma that a mother's

17   death can have on a young child and the need for professional

18   help to overcome this trauma.

19             Without professional help, Christopher really

20   struggled internally throughout his life.  He suddenly had to

21   become much more independent at such a young age.  It was

22   definitely a challenge for Chris, and he did his best to meet

23   these new expectations.

24             What I found most impressive was that Chris began to

25   show the love and compassion he was given by his mom to his

Vol. 1, Pg. 70

Frances Bennett - Statement

1   younger brother John.  Chris felt a huge responsibility for

2   John, even though Chris was just a child himself.  He would

3   help John with his homework and talk to him about navigating

4   the challenges of middle school.  He would be sure to spend

5   time with John while encouraging him to become an independent

6   adult.

7          As Christopher matured, so have the qualities and

8   traits that contribute to his character.  Christopher is

9   extremely intelligent and a goal setter.  From the time he set

10  his sights on attending the prestigious Chaminade High School

11  to his dream of becoming an aeronautical engineer, Chris worked

12  diligently to achieve his goals.

13         Chris loves his family.  He is a devoted son and

14  grandson, and just this week became an uncle.  He worries about

15  his dad's health and prepares meals that are good for his dad's

16  well-being.  He spent a lot of time with his grandmother,

17  helping her recall stories of the past and bringing a smile to

18  her face.

19         Chris recognizes when people are in need and goes out

20  of his way to help in any way he can.  When my husband Bob was

21  ill with cancer last year, Chris would come to visit Uncle Bob

22  and spend time with him.  Since my husband passed away, Chris

23  visits me at least twice a week to use his skills to install a

24  water heater, hang a shelf, or just keep my company.

25         I know my nephew is a good and caring person with

UNITED STATES DISTRICT COURT

Frances Bennett - Statement

1    good family values.  I know also that he is committed to his

2    therapy.  During one of his visits with me, he shared that he's

3    so sorry for his actions, not because of the possible

4    consequences, but because of the hurt his actions have caused

5    to the victims.

6            While I am extremely disappointed and even appalled

7    by Chris' actions, I know that this was a temporary lapse of

8    judgment and a result of the unaddressed trauma he endured as a

9    child.  I know that despite the terrible mistakes that he has

10   made, he's not a threat to others today, because of the remorse

11   that he has showed and the good he has done for those who were

12   in need.

13           I encourage -- I am encouraged that Chris is

14   receiving therapy now and has made significant progress.  He

15   has been out in society and has not committed any additional

16   offense.  I fear that a lengthy incarceration without continued

17   therapy will have a serious and detrimental effect on Chris and

18   his family.  I implore the Court to recognize that Chris'

19   incarceration would not benefit society, but rather with the

20   right mental health treatments and rehabilitation programs, he

21   could be an asset to and contributing member of his community.

22           Thank you.

23           THE COURT:  All right.  Thank you.

24           How long ago did your husband die?

25           MS. BENNETT:  It's actually going to be a year this

UNITED STATES DISTRICT COURT

1  November.

2          THE COURT:  I'm sorry to hear that.  Thank you for

3  coming.

4          MS. BENNETT:  Thank you.

5          THE COURT:  This November is November now.  It's

6  almost Christmas.

7          MS. BENNETT:  The 21st.

8          THE COURT:  Next.

9          MR. BIEBER:  John Buonocore, Chris' father.

10          MS. BENNETT:  Good afternoon, Your Honor.

11          THE COURT:  Hi.

12  WHEREUPON,

13                          **JOHN BUONOCORE,**

14  was called as a witness and, after having been first duly

15  sworn, testified as follows:

16                          **STATEMENT**

17          THE COURT:  All right.  Tell us your name and spell

18  it for the record.

19          MR. JOHN BUONOCORE:  My name is John Buonocore.  I'm

20  Chris' dad.

21          THE COURT:  Okay.  Go ahead.

22          MR. JOHN BUONOCORE:  First, I want to say to all who

23  are here today, I want to express my deepest sorrow for the

24  pain and suffering and violation that you-all must feel.  I

25  cannot know what anguish you may have dealt with over the past

John Buonocore - Statement

1   years due to Chris' actions.  I hope and pray that you heal, as

2   I hope and pray that Chris heals.

3          I love my sons, and I will do anything in my power to

4   protect them from harm, as any parent should.  I cannot imagine

5   or feel the pain that my sons have dealt with through their

6   lives, the feeling of loss and abandonment of young children

7   losing their mother, for she was and is the true love of any

8   child.  I will never know the hurt or living without a mother,

9   because I've had my mother for 92 years, okay, how it must

10  affect young boys seeing their mother.

11         And I don't know if you would like to see these

12  photos, Judge, of what they lived.  Beautiful person going from

13  so vibrant and lovely to a shadow of a person in front of your

14  eyes, at eight, nine, and then years old.  Something like this

15  will drastically affect someone.  I know how it has affected

16  me.  Okay.  I can never imagine what the cancer and pain that

17  they went through and how it affected them.

18         Chris' actions, I believe, were not meant to be

19  vicious.  But in reality, I believe they were a cry for help.

20  Help with pain so deep that none of us with a normal life could

21  never understand.  He's a good man and has always been a good

22  son, good brother, and loving person.  He is kind, considerate,

23  intelligent, and in pain.

24         Chris has tried very hard to overcome his issues, and

25  to being able to heal a wound so deep, I could not understand.

John Buonocore - Statement

1    I understand all seek punishment for him for what he has done.

2    But think for a second, what punishment he will suffer trying

3    to become the person that he really is and wants to be again.

4    He cannot do this alone.  He needs the help of therapy and

5    family to overcome his pain.  To guide him, he needs love,

6    support, and not incarceration.

7                 By sentencing Chris to be alone to contemplate his

8    wrong and his struggle to heal will not help.  It will break

9    the spirit of a good man trying to correct his life, to live it

10   to its full potential.  I beg the Court and the Honorable

11   Judge Barber and all the women here to look upon the struggle

12   that Chris has had of him and forgive him for his mistakes, and

13   to make -- to help make his mother proud of him, because I know

14   he was sorry for what he did.

15                And I thank you today for letting me speak to you.

16                THE COURT:  Thank you.  Any questions?

17                MR. JOHN BUONOCORE:  Excuse me?

18                THE COURT:  I was just seeing if anyone had any

19   questions.

20                MS. THELWELL:  Oh, no, Your Honor.  Thank you.

21                THE COURT:  What about -- I have a question.  One of

22   the first people that talked said that this was brought to the

23   attention of either your other son or you and what's -- what do

24   you know about that?

25                MR. JOHN BUONOCORE:  Yes, Your Honor.  Yes, Your

John Buonocore - Statement

```
 1   Honor.  The one victim, Ms. ████████, had called me at one time.
 2            THE COURT:  She's somebody you knew from being a
 3   little girl.  Right?
 4            MR. JOHN BUONOCORE:  Yes, I do.
 5            THE COURT:  What happened with all that?
 6            MR. JOHN BUONOCORE:  She called me.  I had no idea
 7   what was going on.  I assured her that I would try to find out.
 8   I did speak to Chris about it.  We did discuss it.  He said he
 9   was sorry.  And at that point, within a matter of a few weeks,
10   he was in therapy, which is what I told her.
11            I think she called me a second time.  And I said,
12   "It's your choice to pursue this.  It may be a very difficult
13   suit to pursue against Chris, but I'm telling you he's trying
14   to rectify what he's done.  He's sorry for what he did.  He
15   will not do it, and he is in therapy."
16            At that time, he was an adult.  There's no way I
17   could control an adult.  I cannot take his computer away, hide
18   something from him, or force any adult to do anything that he
19   does not want to do.
20            THE COURT:  Okay.  Thank you.
21            MR. JOHN BUONOCORE:  Thank you.
22            THE COURT:  All right.  What's next?
23            MR. BIEBER:  Can -- would it be okay if Mr. Buonocore
24   speaks at the end, Your Honor, after the objection, and we
25   allocute?
```

1              THE COURT:  That's fine.  That's fine.

2              MR. BIEBER:  So we did just file one substantive

3    objection, Your Honor.

4              THE COURT:  All right.  So let's go -- now we're

5    going to get into the part of this which they don't usually

6    show on TV, because it's rather dry and boring, but it's part

7    of the process.

8              So we'll start -- let me go pack to the prosecution.

9    Have you had the opportunity to read and discuss the

10   presentence report, and do you have any objections to the

11   factual accuracy or Guideline calculations?

12             MS. THELWELL:  Yes, Your Honor.  Yes, Your Honor.

13             THE COURT:  Yes, you've read it, and, yes, you object

14   or --

15             MS. THELWELL:  Oh, I'm sorry.  I thought you only

16   asked if I read it.  I have read it.  I have no objections to

17   the facts or the legal application of the Guidelines.

18             THE COURT:  All right.  So then we go to the defense.

19   Same questions.  Compound question.  Have you had the

20   opportunity to read and discuss the presentence report, and do

21   you have any objections to the factual accuracy or Guideline

22   calculations.

23             MR. BIEBER:  Yes, I've read it.  I've gone over it

24   extensively with my client as well.  And, yes, I have one

25   substantive objection, Your Honor.

 1              THE COURT:  Okay.  We'll come to that in a second.

 2   I'm aware of it.  I ask the defendant at this point, now, this

 3   document called the presentence report, it's very detailed in

 4   this case.  Well, all the cases, they're -- you can sit.  It's

 5   fine.  It's easier if you sit and talk into the mic.  It's

 6   easier to hear in here.

 7              Are you familiar with it, the presentence report?

 8              THE DEFENDANT:  Yes.  Yes, Judge, I am.

 9              THE COURT:  Did you read it?

10              THE DEFENDANT:  Yes, I read it, Judge.

11              THE COURT:  Went over it with your lawyer?

12              THE DEFENDANT:  Yes, I have.

13              THE COURT:  Any questions for him or me about

14   anything in the presentence report before we continue?

15              THE DEFENDANT:  No, I have no questions.

16              THE COURT:  All right.  You will have an opportunity

17   to speak at the end like we just talked about.  Just checking

18   on the presentence report.

19              Okay.  So now go ahead and explain to me the

20   objection that you have.

21              MR. BIEBER:  Yes, Your Honor.  It's straightforward

22   that the United States Sentencing Guideline 2A6.2 applies to

23   the charges that Mr. Buonocore had pled guilty to.

24              And from a factual standpoint and from a legal

25   standpoint, we urge the Court to grant our objection and

                        UNITED STATES DISTRICT COURT

1    sentence Mr. Buonocore -- well, calculate the advisory

2    Guidelines in accordance with our objection.  By the way,

3    there's a footnote to that as well, because the probation

4    officer, about ten minutes before the hearing started, asked me

5    to come outside with the prosecutor and said the addendum to

6    the PSR needs to be further addended.  Is that the word?

7    Further amended.

8              THE COURT:  Amend the addendum.

9              MR. BIEBER:  Amend the addendum, because if you agree

10   with us on our objection, then the addendum did not say that

11   there should be an additional two-point enhancement for a

12   vulnerable victim under 3A1.1(b)(1).  Which would not apply if

13   you don't agree with us, because as the probation officer

14   explained to me, and correct me if I'm wrong, it would be

15   subsumed in that higher advisory Guideline level.

16             THE COURT:  All right.  So now you're losing me.  So

17   for you, this is heads, you win; tails, you lose.  If you win

18   this point, then they add points on?  Right back where you

19   were, is that what you're saying?

20             MR. BIEBER:  No, what I'm saying is, I asked you of

21   an advisory Guideline 41 to 51 months.  And what probation is

22   saying -- they're asking for 108 to 135 or not 41 to 51.  51 to

23   63.

24             THE COURT:  Okay.

25             MR. BIEBER:  That's what I'm saying.  Sorry if it

 1    wasn't clear.

 2              THE COURT:  If you win, they think that the number is

 3    51 to 63; if you win, you think the number is 41 to 51?

 4              MR. BIEBER:  Well, you know, Judge, I mean, I got to

 5    be, obviously, candid with the Court.  I read 3A1.1.  I read

 6    that vulnerable-victim enhancement.  I'm familiar with it from

 7    other cases.  I did not research it with respect to the

 8    applicability here.  I did read the comment section -- while in

 9    that ten-minute period, and I could see how the Court could

10    interpret some of the comments to go against my argument that

11    it wouldn't apply.

12              And what I did see in there is that a bank teller

13    who's the victim of -- I don't know if it said armed robbery or

14    a bank robbery, would not be considered a vulnerable victim.

15    But there were other vulnerable-victim examples that could be

16    analogous to this case where it would apply.

17              So, you know, I'd -- I guess I'd have to look at it,

18    but I got to tell you, in the ten minutes that I looked at it,

19    Judge, just as I'm going to argue to you in good faith, as an

20    attorney with a good-faith basis, to ask you to grant my

21    objection, I don't know if I can argue that two-point

22    enhancement that forcefully, Judge.

23              THE COURT:  Yeah.  I get it.  I understand.

24              MR. BIEBER:  Okay.  So back to where I was, Judge.

25    We rely on the case of United States v. Valle.  And the

                    UNITED STATES DISTRICT COURT

1   probation officer had in the addendum, did a detailed analysis

2   of the case, and then came to the conclusion, the probation

3   officer's conclusion on Page 3 of the addendum, that

4   Mr. Buonocore, quote, formed the requisite specific intent to

5   commit criminal sexual abuse or the production of child

6   pornography.

7          And the legal conclusion that came out in Valle was

8   that Mr. Valle's conduct, as reprehensible as it was, which

9   included, but wasn't limited to, him sharing photographs of

10  women he knew, photographs of his wife on this dark web.

11         I'm maybe, you know -- based on your comments, Judge,

12  maybe a little bit more tech savvy than you, but not much more

13  tech savvy.  I do understand that that dark web is like a

14  second Internet, if I understand it correctly.  And it's where

15  people chat and people actually -- there are drug deals that go

16  on there and things like that.  It's things that they do that

17  they believe are shielded from the public, but nothing on that

18  Internet is shielded from the public, you know, as far as what

19  I believe.

20         But, Judge, in Valle, the defendant had posted these

21  photographs, posted photographs of his wife's colleagues,

22  photographs of his friends, acquaintances, and was chatting

23  with people, and proposing horrific things such as kidnapping,

24  torturing, cooking, I'm not minimizing anything as I rattle

25  these off, cooking these people, raping, murdering, and even

UNITED STATES DISTRICT COURT

1    going so far as to cannibalizing them.

2            The judge granted a judgment of acquittal on that

3    principle of law, Judge, that principle where there's that fine

4    line between fantasy and criminal intent, and how our federal

5    courts do not punish the thoughts of people, and even if those

6    thoughts are put into words and even if its thoughts and words

7    about people that they know.  So we don't arrest people for

8    that.  We don't punish people for that.  No matter how

9    inappropriate.  And the thoughts here and the statements here,

10   Your Honor, were inappropriate.

11           But when we go to the addendum, later on in the

12   addendum where the probation officer notes and summarizes

13   Dr. Jack Herskovits' treatment summary that we provided

14   regarding Mr. Buonocore, and I'm not going to get into it at

15   this point, that progression of his treatment, but I would like

16   to quote and highlight, and this is why I say, Judge, from a

17   factual standpoint, and then putting the overlay of the law on

18   top of the facts, that Mr. Buonocore's Guidelines should be in

19   that either 41 to 51 or 51 to 63 range.

20           Because Dr. Herskovits says, regarding that post

21   about his cousin and those statements about his cousin, to

22   Mr. Buonocore, quote, this was not something that he thought

23   would be actualized in reality.

24           And, you know, case law uses the word fantastical and

25   fantasizing, and I put quotes around -- I put air quotes around

Vol. I, Pg. 82

1    that, because the case law quotes it, and because, you know,

2    that -- that word usually has some sort of positive

3    connotation, and it really doesn't here.

4         But strictly on the law and the facts of this case,

5    we are relying on that for the Court to calculate the advisory

6    Guidelines as we set forth in our objection.

7         THE COURT:  Okay.  So let's talk about it a little

8    differently.  Based on what I've heard so far, I agree with

9    something that was mentioned, this is not a typical

10   cyberstalking case at all, not at all.  It's much, much more

11   involved.  It's different in many ways.  And having heard what

12   I've heard, it's kind of one of the reasons I wanted to hear

13   the testimony first.

14        I'll tell you right now, I don't think the Guidelines

15   adequately address this.  All right?  And they're advisory.  So

16   I'm prepared at this point to agree with you and say that,

17   fine, but that doesn't mean I'm going to be sentencing him

18   within that range, based on what I've heard.

19        So I think in an abundance of caution, I probably

20   should agree with you, but that doesn't mean that, you know,

21   now the sentence is necessarily going to be, you know, 41 to 51

22   or 51 to 63.

23        MR. BIEBER:  I get that.  And I am prepared to

24   address that.

25        THE COURT:  All right.

1          MR. BIEBER:  Yeah.  I get it, Judge.

2          THE COURT:  Okay.  So that's -- that's my thinking on

3    this.

4          Does the government have any thoughts on it?

5          MS. THELWELL:  Yes, I would object, Your Honor.

6          I agree with probation's analysis, as indicated in

7    the addendum.

8          First of all, the Valle case cited by defense counsel

9    is an out-of-circuit case that's not binding on this Court.

10         Secondly, the Valle case is a completely different

11   posture than where we are here, and the facts are completely

12   different.  In the Valle case, the case was occurring at trial.

13   Here we are post plea in a sentencing hearing where the

14   standard is completely different.  There was a judgment of

15   acquittal granted in the Valle case, because the Court found it

16   could not meet that element beyond a reasonable doubt.  Here,

17   it's a matter of preponderance of the evidence as it relates to

18   the Sentencing Guidelines.

19         Secondly, the Valle case explains that in all of the

20   horrific things that that defendant had stated, he also

21   repeatedly said it was a fantasy, and there were things to

22   suggest that there was no substantial step, if you will,

23   committed by Defendant Valle.

24         That's not what we have here.  Defendant Buonocore

25   repeatedly solicited online random individuals to act upon his

1    requests.  Specifically, he provided them with the ammunition,

2    which was the photo identification of these individuals.  And

3    speaking specifically about Victim 2, who is the minor, he

4    provided a photo of her in her school uniform, identifying her

5    school, provided her name, her address, and all of the

6    information, and then specifically said that he would be

7    willing to pay for individuals to act on either raping the

8    victim or somehow tricking her into producing child

9    pornography.

10           And I will -- it's the government's position that the

11   defendant's acts -- the defendant took a substantial step in

12   order to facilitate the rape and the production of child

13   pornography when he repeatedly posted those -- I guess the

14   necessary information that an individual would need in order to

15   complete that act.  And even responded directly to someone

16   after they asked him, "Are you joking," and he says, "I'm

17   100 percent serious.  I want to rape her or see her raped.

18   P.S., the money offer is a serious offer.  I'd give you all the

19   info I could help to facilitate."

20           These are direct quotes that were recovered from the

21   post that he put online.

22           So it's the government's position that the Court has

23   no reason to agree with defense counsel on this objection,

24   because it's not supported by the law, and it's not supported

25   by defense counsel's argument.  This is not a fantasy.

1    Mr. Buonocore intended to take these substantial steps in order

2    to facilitate a potential rape or production of child

3    pornography.

4           And we know that not only based on the conduct

5    directly targeted towards Victim 2, but when you look at his

6    conduct towards all of the other victims, all he did was

7    repeatedly post their information and ask other people to join

8    in with him.  We know from the victims' testimony, the ones who

9    did choose to speak today, as well as the victims who are

10   relying on the statements that have been submitted to the

11   Court, that people did in fact contact them at Mr. Buonocore's

12   request.  And so Mr. Buonocore knew that.

13          I think it was -- it was definitely testified to by

14   one of the statements today.  And it's also contained in the

15   PSR that Mr. Buonocore became aware that these individuals that

16   he didn't know on the Internet were in fact contacting the

17   victims, because he knew at some point that at least one of the

18   victims had become suicidal, and he did not care.  He continued

19   to post.

20          So when you see --

21          THE COURT:  Let me just interrupt you.  Just think

22   through this for a second.  Maybe you're right, and maybe

23   you're wrong.  I just said that I think that this case is not a

24   typical case within the contemplation of the Guidelines.  And

25   let's just suppose hypothetically I gave a sentence that you

1    and the victims were very happy about, and I -- and I went

2    along with what you're just saying now, but, gee, an appellate

3    court thinks that's wrong, the case gets remanded for a

4    resentencing, and the victims do the case all over again, and

5    we're all back here again on a case where the sentence was one

6    that everybody on the prosecution side of things was happy

7    about.  But now we have to do it again, because we're fighting

8    over the advisory Guidelines.  Does that make any sentence?

9           MS. THELWELL:  I 100 percent understand the Court.  I

10   also understand that I just need to make a record as to what's

11   the government's position as to the correct Guideline

12   application, and it's the government's position, is that it's

13   correctly calculated as suggested by probation.

14          THE COURT:  Okay.  Got it.  I'll agree that -- with

15   the defense on this, and -- but we also then have to put in the

16   vulnerable-victim thing we talked about.  So the new range is

17   51 to 63.

18          What's the new offense level under that analysis?

19          THE PROBATION OFFICER:  Your Honor, total offense

20   level would be 24 and criminal history category I.

21          THE COURT:  Right.  Which now with the

22   vulnerable-victim thing, the advisory range is 51 to 63?

23          THE PROBATION OFFICER:  That's correct.  And the fine

24   range, 20,000 to 200,000.

25          THE COURT:  Okay.  So based on our conversation that

UNITED STATES DISTRICT COURT

```
 1   we just had, those are my findings.  Total offense level 24,
 2   criminal history category I, advisory range, 51 to 63, and also
 3   a possible one to three years of supervised release,
 4   $234,024.39 possible restitution, possible fine of 20,000 to
 5   200,000, and a $600 special assessment.
 6             MS. THELWELL:  Your Honor?
 7             THE COURT:  Yes.
 8             MS. THELWELL:  I apologize to interrupt.  I believe
 9   the restitution amount you read was inaccurate.  There was an
10   update to Paragraph 162.
11             THE COURT:  Okay.
12             MS. THELWELL:  That was filed on Friday at
13   Document 40.
14             THE COURT:  Okay.
15             MS. THELWELL:  The number is 164,295.01.  So $164,295
16   and a penny.
17             THE COURT:  All right.  Now, where are we on that?
18   Is that something he's agreeing to or wants a hearing on, or
19   where are we on that?
20             MR. BIEBER:  Government provided all the information.
21   And from a legal standpoint, I do believe there were parts in
22   there that would not be ordered by the Court.  But, instead, we
23   immediately notified the government that we agree to pay it
24   100 percent, Judge.
25             THE COURT:  164,295?
```

```
 1              MR. BIEBER:  Yes, whatever number they provided with
 2   all --
 3              THE COURT:  And one cent.  They were not going to let
 4   the one cent go.
 5              MR. BIEBER:  And the one cent, Judge.
 6              THE COURT:  All right.  Mr. Buonocore, you agree with
 7   that?
 8              THE DEFENDANT:  Yes, Judge, I agree.
 9              THE COURT:  All right.  Okay.  So we can move
10   forward.
11              All right.  At this point, in light of everything
12   we've heard so far, what sentence does the government
13   recommend?
14              MS. THELWELL:  Your Honor, I think you've heard from
15   the three victims here that are requesting the max.  We are
16   requesting an upward -- an upward variance from the Guideline
17   calculation that the Court has just announced of a 51 to 63
18   months to something that would be more appropriate, given the
19   nature of this offense.
20              One moment, Your Honor.
21              THE COURT:  I think before you were asking for the
22   top of the Guidelines under the way you had it calculated, and
23   that was 135 months, I think.  I think that was in your
24   sentencing memo.  Maybe not.  Does that sound right?
25              MS. THELWELL:  I don't think I put -- I never --
```

Vol. I, Pg.  89

```
 1              MR. BIEBER:  They asked for a Guideline sentence
 2    between --
 3              THE COURT:  At the top --
 4              MR. BIEBER:  Between 108 and 135.
 5              THE COURT:  They didn't ask for the top specifically?
 6    Okay.  Fair enough.
 7              MS. THELWELL:  Correct.  I usually just ask for a
 8    Guideline sentence.  But my memo was written at a time when the
 9    Guidelines were different.  But I am still requesting a
10    sentence within that range.
11              THE COURT:  Okay.  Fair enough.  Do you want to make
12    any more arguments on that?  Because where I'm going to go next
13    is I'm going to hear from the defense, I'm going to hear from
14    the defendant, and then we're going to be ready to go.
15              MS. THELWELL:  I would, just briefly, Your Honor.
16    You know, we've sat here for over an hour listening to how the
17    defendant's conduct has directly impacted the victims in this
18    case.  And I just kind of want to touch on a couple of things
19    that the defense witnesses said.
20              You know, obviously his family is here to support
21    him, and that's fine.  But they also sat here and listened to
22    the victims describe not only the defendant's actions, but how
23    his actions have impacted them and continue to impact them to
24    this day.
25              And what's clear is, as the Court has already figured
```

UNITED STATES DISTRICT COURT

 1   out, that this was not a solitary lapse of judgment, as his

 2   aunt has alluded to.  The defendant went on this rampage on the

 3   Internet to essentially terrorize multiple women and a child

 4   for over six years.  He was confronted on multiple occasions by

 5   at least two of the victims during this period of time, and he

 6   continued.  His father was advised and, what, he put him in

 7   therapy.  And guess what happened?  He kept doing it.

 8           So I'm sorry, the government cannot agree with

 9   defense counsel, or the family members of the defendant, asking

10   this Court for any type of leniency, because of the past trauma

11   that apparently Mr. Buonocore has not dealt with since he was a

12   child.

13           Mr. Buonocore's actions directly affected the lives

14   of six -- well, five women and a child, as well as their family

15   members, friends, their jobs, their livelihoods, their

16   reputations.  Imagine your face or your pictures pop up the

17   moment someone does a Google search of your name.  You know,

18   and Mr. Buonocore's late attempts to remove these things from

19   the Internet does not somehow automatically correct or absolve

20   him of his wrong conduct over all this time.

21           And we heard from his father today who also said that

22   he acknowledged when the Court asked him, "Oh, well, did one of

23   the victims talk to you?"  He said, "Yes.  And, you know, she

24   came back a second time, and I told her that, you know, a case

25   would be very difficult."

                    UNITED STATES DISTRICT COURT

1             And why would Mr. Buonocore's father say that?  Well,

2    because like he told the Court, he would do anything to protect

3    his sons, including the defendant.  And so an attempt to

4    stonewall a victim who is trying to take the high road, and

5    instead of going to law enforcement, coming directly to the

6    defendant's father for assistance, and what continues to

7    happen, you know, the victims were not given any reprieval.

8    The defendant continued.  And as described by the victims here

9    in Court, had a long, a long process trying to get law

10   enforcement, local law enforcement to take their -- their

11   situation seriously.

12            And it -- honestly, had it not been for the FBI

13   agents who received this case and did a thorough investigation,

14   I cannot say -- I don't think anyone here can say that the

15   defendant would not have continued with his conduct.  And if it

16   had not been for one of his victims who happened to be an

17   attorney, so she happened to know how to navigate the legal

18   process, to attempt to put a stop to this, I'm not convinced

19   that the defendant would not be continuing to do this.

20            His actions, particularly towards the minor child and

21   his actions after learning that some of these victims were

22   seriously suffering mentally and considering to take their own

23   lives, the fact that that did not deter him is beyond

24   troubling.

25            And I don't think -- it's the government's position

                      UNITED STATES DISTRICT COURT

1    that due to the nature and circumstances of this offense, that

2    the Court has already acknowledged is, you know, beyond

3    whatever, quote, unquote, normal cyberstalking case may look

4    like, there's nothing in Mr. Buonocore's history or

5    characteristics that would warrant the type of sentence that

6    he's requesting.  And I would agree with the victim, that his

7    remorse is too little, too late.

8             And one thing I forgot to address earlier in

9    discussing the objection, in response to what Mr. Bieber said,

10   he read a portion of the PSR relating to the defendant's, I

11   guess, a mental health assessment of some sort, talking about

12   the requisite intent, but what's interesting is that

13   interviewer, that evaluation of Mr. Buonocore was done well

14   after he was arrested and charged with a crime, knowing he was

15   being sentenced to a potentially lengthy prison sentence.  So

16   any self-serving statements that he made during that evaluation

17   should also not be considered.

18            And for those reasons, I'd ask that the Court vary

19   upward and sentence well outside the advisory Guideline range

20   to 135 months.

21            THE COURT:  All right.  Thank you.

22            Defense.

23            MR. BIEBER:  Thank you, Judge.

24            So in preparing for what I wanted to say to you,

25   Judge, initially, it was difficult, and it was difficult

1    because I knew what we were going to hear today.

2              THE COURT:  Not an easy case to defend.

3              MR. BIEBER:  It's not.  So I -- in preparing for

4    sentencings, I always -- I sit there, stand there, and I say,

5    how can I look the Judge in the eye in good faith and ask for a

6    downward variance and ask for a sentence lower than what the

7    government is asking for.  And so I knew it was going to be

8    difficult.

9              And I can do that.  And at the outset, what I want to

10   say to you, Judge, is -- and I know I'm probably stating the

11   obvious, but every single thing I put in that sentencing

12   memorandum, every single thing that's going to come out of my

13   mouth in the next few minutes in no way is to avoid

14   Mr. Buonocore's responsibility for what he did, minimize what

15   he did, offend, denigrate, minimize any one of the six victims

16   in this case.  It was never -- you know, when I wrote what I

17   wrote in that sentencing memorandum, I hope it was received by

18   the Court as respectful.  And that's all I have ever tried to

19   do in my 27 years as an attorney.

20             So how can I ask you for that, Judge?  I'm asking you

21   under the 3553 factors to consider the whole of Mr. Buonocore,

22   of who he is.  And by the way, you know, yeah, a difficult case

23   to defend --

24             THE COURT:  Let me ask you a question.

25             MR. BIEBER:  Yeah, Judge.

                    UNITED STATES DISTRICT COURT

Defendant's Allocution

```
 1              THE COURT:  Let me ask you a question.
 2              MR. BIEBER:  Sure.
 3              THE COURT:  Maybe he ought to talk now, and then you
 4   give your final presentation, or you want to -- you're
 5   intentionally doing it this way?  I'm okay.  I just want to
 6   make sure we're not slipping into a, you know -- because it
 7   sounds like you're going to make your main pitch right now
 8   before I've heard anything from him that you're going to be
 9   talking about.  Whatever you want to do.
10              MR. BIEBER:  Let's do it your way.
11              THE COURT:  Yeah.  Go ahead.
12              MR. BIEBER:  I gotcha, Judge.
13              THE COURT:  Go ahead.  You're under oath from before.
14   So go ahead.
15              THE DEFENDANT:  Correct, Judge.  Thank you.
16   Thank you for letting me speak.
17              I knew this day would come, Judge.  Maybe I even knew
18   it was going to come while I was doing those things.  I, under
19   oath, most likely I did.  This is the rock bottom for me,
20   Judge.  This is a place that I never thought I would ever be,
21   in a federal courtroom, having -- facing judgment, facing, you
22   know, penalties, whatever it may be.  I can't say that I ever
23   thought I would be here.
24              I'm a big disappointment to my family that came, even
25   came here to still help me.  They say what they had to say.
```

Defendant's Allocution

1    They believe in me.  They're proud of me.  I don't know how

2    they are, but they said it, and I believe them.  I disappointed

3    my dad beyond words.  I've destroyed my brother and his family.

4    I'm glad my mom is dead, because if she was here to see this,

5    that would have killed her.  I'm sure of it.

6              And I'm telling you this, and it still doesn't

7    compare to what I did to them.  It doesn't.  It doesn't compare

8    to what I did.  There's no reason why I did it.  I can't even

9    say something here that will fix it.  I want to fix it.  I wish

10   I never did this.  I wish I never hurt Dana.  I wish I never

11   hurt ███████.  ███████, I wish I never hurt you.  ███████,

12   ███████, ███████, all of them, ███████, I was -- I was out of my

13   mind.  It's not who I am.  It's not who I ever was.

14             I hope you guys hate me forever.  I really do.

15   Because I will hate me forever.  And you guys know a little bit

16   about me, that I will hate myself forever, because I was

17   friends with you.  And that is horrible.  What I did is

18   horrible.  And you're right, everything you guys said here, I

19   am a monster.  I am.  I feel like a monster.

20             I felt like a monster for a long time.  I felt like a

21   monster since I was seven years old.  My mom was sick.  I

22   thought the reason why she was sick was because I'm a monster.

23   And maybe the reason why I did this stuff is because I've been

24   thinking I've been a monster since I was seven years old.

25             That's what I found in therapy, that I found these

Vol. 1, Pg. 96
Defendant's Allocution

1   thoughts, these thoughts of me being evil, that I'm the devil's

2   child.  These are things that were in my mind as far back as I

3   could remember.

4        And that's how I know that I'm not going to do this

5   again, no matter what punishment, Judge, that you lay on me.  I

6   will never do this again, because the therapy has helped me.  I

7   know that this is the reason why I did it.  I'm a monster.  I

8   think I'm a monster.  I thought I was a monster.

9        And with therapy, I'm fighting those demons and

10  fighting that feeling.  And I don't want to feel like a

11  monster.  I don't want to be a monster.  I want to be what my

12  mom would have wanted me to be, which is kind to my family,

13  help my family, help my friends.

14       I've lost all my friends, and I deserve to lose all

15  of them.  I put them in places that they should never be.  I

16  deserve a lot of what's coming to me, and I am well aware of

17  that.

18       And I'm sorry just doesn't do it for me, and it

19  doesn't do it for them.  They said it doesn't do it for them.

20  I know it doesn't do it for them.  But I can't say anything

21  else but that I'm sorry.  And I'm sorry from the bottom of my

22  heart.  I will -- whatever it is, I won't do it again, and I

23  will be better.  If not for me, it's for all of you for me to

24  be better.

25       You guys came here, doing the hardest thing you can

Defendant's Allocution

1    do, to come here and put it to my face and tell me that I'm a

2    piece of shit.  That's what they told me.  And I agree.  I

3    agree.  And I thank all of you for doing that for me, because

4    it wouldn't have changed me if they didn't do this to me.

5            They're right.  This has changed.  I have been

6    changed, and I will continue to be changed, because I don't

7    want to be here.  I don't want to be here.  I don't want to

8    ever do this again.  I don't want to hurt them.  I can't feel

9    their pain, and I don't pretend that I do, and I'll never

10   pretend that I do.

11           But I'm sorry, ladies.  I'm sorry, ███.  I'm sorry,

12   ███.  I'm sorry, ███.  I'm sorry, ███.  I'm sorry,

13   ███, ███, and ███.  I'm sorry.

14           Again, you don't have to believe me.  I don't expect

15   you to.  And it's fair, very fair of you.  I'm sorry.  And I

16   will do my best to show you guys that I am sorry, and I won't

17   be here again.  And, hopefully, I can contribute something to

18   the world.  Maybe I can.  Maybe I can't.  I'm just sorry.  I

19   really am.

20           Thank you, Judge.

21           MS. THELWELL:  Your Honor, briefly, I saw while the

22   defendant was speaking, in the chat, every time he's turning

23   around, they can't really hear, because the microphone is not

24   picking up.

25           THE COURT:  Everything he just said, they didn't

 1   hear?

 2          MS. THELWELL:  Not everything.  When he would turn

 3   his back and address the gallery, the victims on Zoom could not

 4   hear.

 5          THE COURT:  Oh, the victims on Zoom.  Well, that

 6   might be the price that we have to pay for Zoom.

 7          MS. THELWELL:  I understand.  I just wanted to put on

 8   the record.  And also they indicated that when defense counsel

 9   is speaking, they just ask if he stay in front of the

10   microphone so that they can hear.

11          THE COURT:  Okay.  Those of you on Zoom, he

12   apologized to people by name.  I assume that those are some of

13   the names on Zoom, because the information I get is initials.

14          MS. THELWELL:  That was going to be my next point.  I

15   can get with the court reporter, but I'm going to ask that the

16   names be redacted, especially the name of the minor victim.  I

17   believe there may be members of the press currently in the

18   room.

19          THE COURT:  Well, yeah, that's fine.  That's fine.

20          Yeah.  Go ahead.

21          MR. BIEBER:  Thanks.  I didn't prepare that with him,

22   not for a second.  Just as those apology letters that were

23   rightfully so criticized as being, you know, one-paragraph

24   letters, I don't do it.  I won't write apology letters.  It's

25   got to come from him.

 1          So, Judge, I left off with how I could ask you for

 2   it, and ask you for a downward variance, or here, if you're

 3   indicating you're inclined to give an upward variance, to not

 4   do that.

 5          It's not -- his mother's passing, it's not an excuse.

 6   We didn't put on this psychological defense so that we could

 7   explain away the conduct, because you know what, with that

 8   treatment summary from his doctor that was attached to the

 9   addendum that you read, where he's been in therapy consistently

10   since 2019, we didn't attach all the progress reports, but I

11   was getting progress reports once I came into the case, it's

12   not an excuse.

13          It's a partial explanation as to how someone like

14   this from a family, from an upbringing could get here.  It's a

15   partial explanation.  Because of that feeling when you're a

16   young boy -- I mean, I can identify with whatever scars I have

17   from childhood, and I know what they are, and I know what we

18   went through as a family, and ours were, you know, primarily

19   based on major financial hardships, and I know, looking back,

20   how that affected me.

21          You can't know unless you literally watch your mother

22   die of cancer.  And you know what, you really can't know

23   cancer, by the way, Judge, until it's in your house.  Cancer is

24   that -- it's a six-letter word, like I kind of see it.  And,

25   you know, this one had cancer, this one has cancer, ooh, that

1    person has cancer.  When it's in your house, Judge, it's got a

2    whole -- it's spelled the same way, but it's a totally

3    different thing.  Unless you've gone through it, you have no

4    idea.  And we have no idea what he went through as an

5    eight-year-old, as a nine-year-old for a couple of years

6    watching this.

7           But what effect does that have after?

8    Psychologically, sure, textbook innocence, that sense of

9    abandonment, the inability to form meaningful relationships,

10   the anxiety -- we all have anxiety as teenage boys and going to

11   school and wanting to fit in and wanting, you know, girls or

12   boys to like us.  That social anxiety, it's like enhancing it

13   on steroids beyond belief, that feeling inside, and then couple

14   that with depression, with that black cloud that you can't

15   physically or emotionally get out of, because it's there, and

16   it's real.

17          And then sometimes suicidal ideations.  That's what

18   he was going through post.  Not an excuse.  Not to minimize his

19   conduct whatsoever, but a partial explanation.

20          And if it sounds like I'm begging, I am.  I'm

21   begging --

22          THE COURT:  Don't beg.  Don't beg.

23          MR. BIEBER:  All right.  I'm not begging.  Your

24   Honor, I'm asking you, wholeheartedly, to consider that as part

25   of his personal characteristics.

1          Judge, I cite to cases to avoid sentencing

2    disparities under stalking.  But you know what?  Yeah, this

3    case is way different.  Couldn't find anything factually

4    similar.  Sure, you have people who killed animals and sent

5    dead animals to their victims or sent fecal matter and things

6    like that, and they're getting, rightfully so, sentenced to

7    four years in prison, three years in prison, with extenuating

8    circumstances, perhaps probation.  There ain't no way I'm

9    looking you in the eye and asking you for anything like that,

10   Judge.  Probation or house arrest does not fit here.

11          But I also cite to Mr. Buonocore's low rate of

12   recidivism, not just because of the BOP Guidelines, Judge.

13   Why?  Because of that, yes.  But also, the photos, I have no

14   idea how to take them down, but my law clerk, who is tech

15   savvy, did and does.  So we embarked on this thing called -- we

16   called it the takedown project.  And I would methodically, as

17   my law clerk would take down photographs, send the information

18   to the prosecutor.

19          And, of course, Mr. Buonocore did not participate in

20   it whatsoever, abiding by his bond restrictions.  But we did

21   let him know numbers, tallies, as we were going.  And we were

22   able to remove 1,366 of the photographs.  And as part of that

23   restitution, Judge, it's in there about paying lawyers and a

24   service for lifetime to take down photos.  Absolutely.  Why

25   wouldn't Mr. Buonocore agree to that?  So --

                    UNITED STATES DISTRICT COURT

 1          THE COURT:  Well, while you're on that point, I've

 2    just been thinking about this.

 3          MR. BIEBER:  Yeah.

 4          THE COURT:  You know, in a civil copyright case or

 5    something like that, you know, the judges do injunctive orders

 6    saying, stop publishing this, stop doing this.  I'm not -- I'm

 7    not sure why there shouldn't be something like that.  I

 8    mentioned that earlier.  The prosecutor is going to look into

 9    it.  And that -- that ought to make what you're talking about

10    easier.

11          MR. BIEBER:  Easier, and they will have our

12    cooperation.  You know what?  I think that -- I think that the

13    statements that were directed to me were -- came from a

14    misinterpretation.  This kind of does go to low rate

15    recidivism.  I wasn't one of those two lawyers dealing with the

16    civil matter in this Middle District, Judge, with the John Doe

17    lawsuit.  Uh-uh.

18          Here's what happened.  I was that third lawyer,

19    because I had a cordial conversation to try to settle this

20    lawsuit.  Mr. Buonocore called me, and there were numbers that

21    were thrown out, so I made a phone call.

22          Things went sideways when my name found its way into

23    a pleading to accept service of a lawsuit.  And you know,

24    Judge, you accept service in the Middle District on a civil

25    federal case, you're in it.  And I don't do that kind of work.

                      UNITED STATES DISTRICT COURT

1    So things kind of went south there.

2            Judge, I have never released the name of a victim.

3    Never even gave a clue to anyone to do that.  Never would ever,

4    ever.

5            So what I did do, Judge, the second we found out,

6    after that phone call, you know, with the attempt at the

7    settlement and then we found out that there was a criminal

8    investigation, so what did I do?  I picked up the phone and I

9    called Bob Mosakowski.

10           I said, "If you can tell me, here's his name, date of

11   birth, if you can tell me there's a criminal investigation,

12   because he hasn't been arrested yet, he wants to cooperate.  I

13   have somebody who committed criminal conduct and he knows he's

14   going to face the music."

15           And Mr. Mosakowski said to me, "Well, you'll either

16   hear from me or someone in my office or you won't."

17           THE COURT:  Okay.  Great call.

18           MR. BIEBER:  Yeah.  You know what?  Then I get a call

19   from Ms. Thelwell.  And you know what?  Ms. Thelwell and I,

20   that information was one of those true informations being

21   filed, based on that type of conversation.  You can only

22   imagine how those conversations went.  They were not the

23   negotiations or anything like that.  All at the direction of

24   Mr. Buonocore.  Not to excuse his conduct in any way.  To give

25   you, Judge, the picture, that picture of him.

1          And that's why we submit the letters.  There's a

2    judge that really gets irritated in the Southern District of

3    Florida, whose name will go unmentioned, and I say, even when

4    I'm before that judge, we only know what's going on in this

5    courtroom, in the sentencing memoranda and the PSR.  These are

6    people who know the person.  And that's all -- that's what we

7    want you to do.  We want you to consider that.

8          So, Your Honor, yeah, that treatment summary does

9    show that the therapy, as Mr. Buonocore said, is working.  Not

10   one violation in two years, except, and you saw that memo,

11   Judge, I don't -- you know, I am getting a little older and

12   losing hair.

13         THE COURT:  Yeah, I wondered what the gender reveal

14   was.  But I think that means people that are having a baby.

15         MR. BIEBER:  It does.  Okay.  And what was happening

16   was, his aunt -- actually, his aunt who's here -- didn't know

17   how to work the phone and handed it to Mr. Buonocore.

18         THE COURT:  That's fine.  I'm not worried about that.

19         MR. BIEBER:  And the reason why I raise it, Judge, is

20   he can abide by the law.  He can follow the law.  He is

21   committed to therapy.  And sure I'd love to ask you for a

22   period of probation and house arrest and lengthy supervision

23   and get him that therapy.  Can't do it, Judge.  I -- I can't do

24   it, and I told Mr. Buonocore I can't do it.

25         So, yeah, I was going to ask you for a slight

                    UNITED STATES DISTRICT COURT

```
1    downward departure from 41 months, and I was going to ask you
2    for a sentence of 24 months in prison, but I can't do that.
3    You're not going to grant it if I did.  But I -- I can't look
4    you in the eye and say that's fair based on these facts.  I
5    can't.
6              And what I think is fair, or what I can ask you for,
7    you know, obviously, there will be a difference of opinion.
8    So, Judge, I am asking you for a sentence of 50 months in
9    prison, followed by ten years of supervised release with
10   stringent conditions that the Court deems appropriate.
11             THE COURT:  All right.  Thank you.  The prosecution
12   is asking for what, 130 months.  Is that right?
13             MS. THELWELL:  It was 135, whatever the top of the
14   old Guidelines.
15             THE COURT:  135.
16             MS. THELWELL:  Your Honor, maybe just clarify from
17   probation, I don't think you can stack supervised release in
18   that manner, as requested by defense counsel.
19             MR. BIEBER:  Maximum supervised release, then, is my
20   request, Judge.
21             THE COURT:  What is the maximum supervised release,
22   out of curiosity?
23             THE PROBATION OFFICER:  Three years, Your Honor.
24             THE COURT:  Three.  The maximum for each one of these
25   counts is five, which can be stacked consecutively.  So,
```

```
 1    really, the possible maximum is five times six, which is 30.

 2    Right?  We all agree on that?  Yes?

 3              MS. THELWELL:  Yes, Your Honor.

 4              THE COURT:  But everyone needs to understand, when

 5    people come and ask for the maximum, it's almost never the

 6    appropriate sentence to give someone who pled guilty the

 7    maximum, because that's the worst they could get if they went

 8    to trial.  So why would we -- it wouldn't be fair to a person

 9    who pled guilty to give them the maximum.  They might as well

10    go to trial, make the victims come in, show all the pictures of

11    the nude people, and everything like that, and then give them

12    the maximum, if that was appropriate.

13              In a plea, it's not usually a situation where someone

14    gets a maximum sentence.  It just doesn't make sense to do

15    that.  It really isn't fair.

16              Let's take just a very short break at this point.

17    Everybody is done now?  Everybody is done?

18              MS. THELWELL:  Yes, Your Honor.

19              MR. BIEBER:  Yes, Judge.

20              THE COURT:  Let me see both lawyers only in my

21    office, please.  All right?

22         (Proceedings recessed at 4:56 p.m.)

23

24

25
```

1                    **CERTIFICATE OF REPORTER**

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4              I, Rebekah M. Lockwood, RDR, CRR, do hereby certify

5    that I was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10       I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16   Hillsborough County, Florida, this 18th day of January 2022.

17

18

19

20       _____

21       REBEKAH M. LOCKWOOD, RDR, CRR
         Official Court Reporter
22       United States District Court
         Middle District of Florida

23

24

25